**In re Albert R. SMITH, Debtor.**

**OHIO CASUALTY INSURANCE COMPANY, Plaintiff,**

v.

**Albert R. SMITH, Defendant.**

**Bankruptcy No. 91–03498–C.
Adv. No. 92–0321–C.**

United States Bankruptcy Court, N.D. Oklahoma.

Sept. 13, 1993.

Kenneth G.M. Mather, Steven W. Soulé, Tulsa, OK, for plaintiff.

Charles P. Seger, Tulsa, OK, for defendant.

Katherine Vance, Asst. U.S. Trustee, Tulsa, OK.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

This matter comes on to be heard upon the adversary complaint filed by Ohio Casualty Insurance Company ("Ohio Casualty") against the Debtor, Albert R. Smith ("Debtor") seeking a determination that its debt is nondischargeable pursuant to § 523(a)(2)(B) of the Bankruptcy Code. Ohio Casualty filed a trial brief after which a one day trial was held. Upon hearing the testimony of the witnesses, the arguments of counsel and reviewing the documentary evidence presented, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Debtor was the former owner of the Louisville Red Bird Cardinals, a Triple A baseball franchise. Debtor sold his stock in 1984 for $4,000,000.00 or $5,000,000.00 and used the proceeds to pay off debts. As part of the transaction, the corporation loaned Debtor $1,500,000.00. At the time of the sale, Debtor leased all of the concession equipment which he owned personally to an entity known as Kentucky Sports. Kentucky Sports was to pay for the lease over a period of ten (10) years at which time it had the option to purchase the equipment for a nominal amount. The amount of the lease payments equalled the amount of Debtor's payments on the debt owed to the corporation. As a result, Kentucky Sports made its lease payments directly to the corporation. Debtor described the transaction as "a wash."

Following the sale, a dispute arose between the Kentucky State Fair Board and Debtor over the lease of the stadium in

Louisville where the Cardinals played. The Kentucky State Fair Board sued Debtor personally in state court and on May 3, 1990, judgment was entered against Debtor in the amount of $65,000.00.

Debtor thereafter applied for an appeal bond in the above amount from Ohio Casualty. As part of the application, Debtor was required to list a schedule of his assets and liabilities. Debtor had his accountant, Jim Wheeler ("Wheeler")[1], complete the form for his signature. The figures appearing on the application were taken directly from a "compilation" prepared by Wheeler for Debtor for the year ending December 1989. Compilations such as this one were prepared for Debtor annually and Debtor relied upon them in the operations of his business. The compilations stated that they were unaudited and were prepared from information supplied by Debtor.

The application listed Debtor as having a net worth of $1,618,141.00. Debtor "scanned" the application and signed it on May 15, 1990.[2] He recognized the figures on the application to be the same as those appearing on his 1989 compilation.

Based upon the application, Ohio Casualty executed a bond on Debtor's behalf in the requested amount. Debtor subsequently lost the appeal and Ohio Casualty paid the judgment and has a claim against Debtor in the amount of $77,000.00 plus attorney fees and costs.[3]

There are three main entries appearing on the application which Ohio Casualty alleges are materially false: An amount due from the LRBC Liquidating Trust of $294,417.00; notes receivable in the amount of $533,036.00; and an investment in oil and gas properties valued at $1,429,179.00.[4]

The asset listed on the application in the amount of $294,000.00 owed from the LRBC Liquidating Trust represents an accounting entry. It is not a real asset of Debtor. Debtor was not familiar with what this number represented but was informed by his accountant that it was proper accounting procedure to list it as one of his assets. Debtor's current accountant, Keith Ward, explained the entry as follows: If Debtor had paid the balance due on the loan to the corporation in 1989 when the compilation was prepared, the present value of the monies he would receive from Kentucky Sports over the amount paid would equal $294,000.00. This situation did not exist because Debtor did not have the money to pay the loan. Therefore, this amount should not have been listed as an asset of Debtor.

■ The entry on the financial statement of $533,000.00 represents notes receivable due to Debtor from three of his children.[5] The evidence is conflicting as to whether this figure represented an asset of Debtor on the date of the application. A gift tax return for the year 1990 shows that Debtor made a gift of these notes to his children on January 1, 1990, which was prior to the date the bond application was submitted in May 1990.

However, both Debtor and his current accountant testified that Debtor actually decided to gift the notes due from his children in late 1990, which was *after* he executed the bond application. The accountant further testified that the date appearing on the gift tax return was backdated for tax benefit purposes on his advice and does not reflect the actual date the gift occurred. Finally, Ohio Casualty introduced no evidence showing that these debts were fictitious or uncollectible.

The Court finds that the testimony of Debtor and his accountant was credible and that on the date the application was com-

---

1. At the time of trial, Wheeler was deceased.

2. While the application states that it represents Debtor's financial status as of December 31, 1990, it is undisputed that it actually reflects Debtor's status as of December 31, 1989.

3. The record is unclear as to why Ohio Casualty had to pay $77,000.00 on a $65,000.00 bond.

4. Ohio Casualty challenged other entries on the statement, however, they are not material and it is the above three items which were most heavily litigated.

5. The specific amounts owed by each child are set forth on Debtor's 1989 compilation.

pleted the notes from his children were owed to Debtor and represented an asset of Debtor which was properly listed on the application.

Most of the testimony at trial concerned the valuation of Debtor's interest in oil and gas properties at $1,429,179.00. In the early 1960's, Debtor invested $50,000.00 with a group known as Venture Exploration which owned a twenty-five percent interest in a number of oil and gas leases covering 60,000 acres in Southeast Oklahoma. His investment entitled him to a one-sixth interest in Venture Exploration's twenty-five percent interest. Debtor eventually gave his children a part of his one-sixth interest and at the time he presented the application to Ohio Casualty, he owned seventy percent of his one-sixth interest, with three of his children owning ten percent each.

Debtor was invited to participate in this investment by Richard T. Sonberg ("Sonberg"), a Tulsa attorney formerly employed with the law firm of Houston & Klein. Sonberg has had over twenty years experience in the oil and gas business, including the development and drilling of oil and gas leases. In 1968, he started an independent oil company known as Western Diversified Industries which ran an exploration program. He currently owns and manages a number of drilling companies, one of which is Venture Exploration. He is president of Sundown Exploration Company[6], Rega Corporation and Wyndemeer Oil Company and is involved with Cherokee Operating Company.

In 1972, Sonberg became involved with Service Drilling Company which was engaged in a large exploration project in Southeast Oklahoma. He formed Venture Exploration with five other people, one of which was Debtor. Sonberg was instrumental in organizing an agreement between Service Drilling Company and two major pipeline companies for the purchase of the gas produced by the wells. This contract was very favorable to Venture Exploration because the price of the gas was double that of the spot market. Over the years it has produced substantial income for the interest owners, including Debtor.

As stated earlier, the value of Debtor's interest in the oil and gas wells on the application was taken directly from Debtor's 1989 compilation. The compilation states in a note that the value represents the estimated value as determined by Debtor after consultations with Keplinger & Associates and Venture Exploration. In fact, the evidence established that it was Wheeler, not Debtor, who arrived at the $1,429,179.00 valuation.

Wheeler relied upon the Keplinger report and the representations of Venture Exploration through Sonberg in computing the value of Debtor's oil and gas interests. In 1984, Keplinger & Associates gave a written report which estimated the value of the producing wells of Venture Exploration. This report did not value the undeveloped gas reserves. The report estimated Debtor's one-sixth interest to be worth approximately $867,000.00. Because Debtor owned only seventy percent of his one-sixth interest at the time of the application his interest was worth $607,000.00 according to the Keplinger report.[7]

In addition to reviewing the Keplinger report, Wheeler also had telephone conversations with Sonberg and received written evaluations from him. In the late 1980s, Sonberg valued Debtor's one-sixth interest in the producing wells to be worth approximately $600,000.00. The value was therefore overstated by approximately $800,000.00.

The $1,429,179.00 figure, while overstated was computed in a reasonable fashion and the Court finds that it was reasonable for Wheeler, based upon the information he had, to value Debtor's oil and gas interests in this amount. Considering the

---

**6.** This company currently manages approximately 100 wells.

**7.** The 1989 compilation states that Keplinger valued Debtor's interest at $885,000.00 rather than $607,000.00. This larger amount is close to the value of the entire one-sixth interest, however, the discrepancy was not discussed at trial.

information available to Wheeler, both Debtor and Wheeler in good faith believed the valuation of the oil wells to be accurate.

Any conclusions of law which ought more properly to be findings of fact are incorporated herein by reference.

## CONCLUSIONS OF LAW

Ohio Casualty argues that its debt is nondischargeable under § 523(a)(2)(B) which states as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money ... to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The parties have stipulated that there was a statement in writing regarding Debtor's financial condition and upon which Ohio Casualty relied in executing the bond in Debtor's favor.[8] Therefore, the only two elements at issue in this case are whether the statement was materially false and if so whether it was made with the intent to deceive or with a reckless disregard as to its truth. Ohio Casualty has the burden of proving these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In order for a statement to be materially false, it must be substantially inaccurate. *In re Black,* 787 F.2d 503 (10th Cir.1986); *In re Reeds,* 145 B.R. 703 (Bankr.N.D.Okl.1992). The Court finds that the application presented to Ohio Ca-

sualty was materially false in the following respects. It listed as an asset of Debtor the amount of $294,417.00 which in this Court's opinion did not exist. This figure was based purely on a hypothetical situation. The fact that it was computed using proper accounting procedure does not make it a real asset. The statement also substantially overstated the value of Debtor's oil and gas properties. Upon reviewing all of the evidence submitted, the Court finds that Debtor's interest was actually worth $600,000.00 in 1989. Therefore, Debtor's net worth was overstated by over $1,000,-000.00 and this made the application materially false.

The main issue in this case is whether Debtor presented the application with an actual intent to deceive or with a reckless disregard as to its truth. If a statement is given with a reckless disregard as to its truth or falsity, even though there is no actual intent to deceive, this is sufficient to deny the discharge of the debt. *In re Black,* 787 F.2d at 506; *In re Bailey,* 145 B.R. 919, 931 (Bankr.N.D.Ill. 1992); *In re Reeds,* 145 B.R. at 707. Ohio Casualty did not introduce evidence sufficient to establish that Debtor had an actual intent to deceive. In fact, it concedes this point.

Ohio Casualty contends, however, that Debtor's failure to carefully read the application, his failure to investigate the validity of the numbers, and the fact that the compilation from which the numbers were taken was unaudited constituted a reckless disregard of the truth of the statement.

The Court finds that the Ohio Casualty has not proven by a preponderance of the evidence that Debtor offered the application with a reckless disregard as to its truth. Debtor scanned the application before signing it and was familiar with its contents. He knew that the figures on the application were the same as the figures on his compilation. He believed that the numbers on the compilation were accurate. He

8. The Court notes that if Debtor had not stipulated to reliance the Court may have found that there was no reliance. The Court finds it difficult to believe that Ohio Casualty would have refused to issue a $65,000.00 appeal bond if it had known that Debtor's net worth was only $618,000.00.

had always relied upon these compilations in the past and the Court finds that he had a right to do so because all of the figures were computed on a reasonable basis.

Debtor's accountant, Wheeler, computed the $294,000.00 value using proper accounting procedure. Wheeler explained this to Debtor and the Court finds that Debtor had a right to rely on Wheeler's expertise as an accountant to make only correct accounting entries. In addition, Wheeler computed the value of Debtor's oil and gas interests by considering the valuations of two expert's opinions plus the income information on the wells. There is no evidence that Wheeler intentionally or fraudulently inflated the value of Debtor's oil and gas interests.

The Court finds that Debtor, who was not knowledgeable in the oil and gas business, had no way of knowing that the figures on the compilation were overstated. Even if Debtor had reviewed the statement more thoroughly and had questioned Wheeler in regard to its accuracy, Debtor would have been told that the numbers were correct. Wheeler had based all calculations upon proper accounting procedure, expert opinion and Debtor's income from the wells. Wheeler had a right to rely on these authorities and Debtor had a right to rely on Wheeler. For Debtor to do so was not a reckless disregard of the truth.

The issue of whether a debtor has a right to rely upon his financial advisors in the making of a financial statement is thoroughly discussed in *In re Aste*, 129 B.R. 1012 (Bankr.D.Utah 1991). In this case, the court stated:

> The current trend indicates that if the debtor had no reason to believe the information was *incorrect* and therefore failed to verify the information, reckless intent will not be found. The difference is significant, especially in consideration of the evidentiary standard set forth in *Grogan*. If the presumption is that a debtor may rely on information reasonably obtained through normal business channels, then a creditor must prove by a preponderance of the evidence that some fact should have caused the debtor to

inquire further, and that the failure to inquire was reckless.

\* \* \* \* \* \*

> There is no evidence in the record that the information seen by the Debtor or the errors in the application were such that he "knew or should have known of the falsity of the statement." (Citation omitted)

\* \* \* \* \* \*

> If the court adopted [the creditor's] position, officers or managers of businesses may be prevented from relying upon the financial information provided to them by their accountants or bookkeepers. Without some reasonable cause to believe that the information is incorrect, incomplete, inconsistent, or subject to further inquiry, debtors should be able to rely upon the information obtained by competent, skilled employees responsible for performing that task.

*In re Aste*, 129 B.R. at 1019–1020.

In a leading case under the Bankruptcy Act, the Tenth Circuit held that a debtor has a right to rely on the expertise of his accountant where he does not know the accountant is falsifying the information. In *Wolfe v. Tri–State Ins. Co.*, 407 F.2d 16, 19 (10th Cir.1969), the Tenth Circuit stated:

> [The debtors] testified that they did not instruct the CPA to do other than to make a correct financial statement. They had every right to rely upon [the accountant] to make a correct statement, as do even sophisticated men of long business experience rely upon their trusted CPA to handle these affairs. Therefore, we cannot agree with the reviewing judge that these bankrupts had sufficient knowledge of the falsity of the statement. Nor can we agree with the reviewing court that the bankrupts were guilty of reckless negligence by failure to check over the statement.

█ Ohio Casualty argues that Debtor is responsible for the fraudulent acts of his accountant. *In re Reisman*, 149 B.R. 31 (Bankr.S.D.N.Y.1993); *In re Coughlin*, 27 B.R. 632 (Bankr.BAP 1st Cir.1983). This

rule of law is correct but is not applicable to the present case.

In all of the decisions cited by Ohio Casualty, the figures placed on the financial statements by the accountant were obviously false and could have been discovered by the debtor upon a cursory examination of the statement. In the present case, in accordance with the above discussion, this is not true.

Bankruptcy and its discharge provisions are meant for the honest but unfortunate debtor. The Court finds that Albert R. Smith is an honest debtor. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

A separate judgment order consistent with the Memorandum Opinion will be entered finding that the debt owed by Debtor to Ohio Casualty is not excepted from discharge pursuant to § 523(a)(2)(B) of the Bankruptcy Code.