**In re Chai Cho OH, Debtor.**

**Merchants Bank of California, a National Banking Association, Plaintiff,**

**v.**

**Chai Cho Oh, also known as Samuel Chai Cho Oh, Defendant.**

**Bankruptcy No. LA 01–23689–BB. Adversary No. LA 01–01949–BB.**

United States Bankruptcy Court, C.D. California.

June 7, 2002.

Susan Carole Jay, Law Offices of David Bloom, Los Angeles, CA, for plaintiff.

Mary Lee, John E. Sweeney & Associates, Los Angeles, CA, for debtor/defendant.

## MEMORANDUM OF DECISION AFTER TRIAL OF ADVERSARY PROCEEDING

SHERI BLUEBOND, Bankruptcy Judge.

Merchants Bank of California ("MBC") brought this adversary proceeding against debtor Chai Cho Oh ("Debtor") under 11 U.S.C. §§ 523(a)(2)(A),[1] 523(a)(2)(B) and 523(a)(6). Based on the findings of fact and conclusions of law set forth below, the

---

1. Although MBC's original complaint does not make reference to 11 U.S.C. § 523(a)(2)(A) the parties' joint pretrial order entered February 22, 2002, (the "Pretrial Or-

Court finds that the Debtor's obligations to MBC are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Concurrently herewith, the Court will enter a separate judgment in favor of MBC on its first claim for relief on terms that are consistent with this memorandum.[2]

Both parties filed trial briefs, declarations setting forth the direct and reply testimony of their witnesses and evidentiary objections to each other's declarations in accordance with this Court's February 7, 2002 "Order Setting Trial Date and Establishing Procedures for the Conduct of Court Trial." The Court conducted a one-day trial of this adversary proceeding on April 16, 2002, at the conclusion of which, the Court entered its "Order (1) Admitting Exhibits and Declarations into Evidence, (2) Ruling on Evidentiary Objections and (3) Setting Post–Trial Briefing Schedule" (the "Evidentiary Order"). Upon review and consideration of (a) the facts admitted in the February 22, 2002 "Revised Joint Pre–Trial Order," (b) the parties' respective pre- and post-trial briefs, (c) the oral argument of counsel, (d) the parties' declarations and documentary evidence, to the extent admitted into evidence in the Evidentiary Order, and (e) the deposition testimony of Daniel Roberts, and having heard the oral testimony of the parties' witnesses at the time of trial, the Court makes the following findings of fact and conclusions of law:

## I

## FINDINGS OF FACT

From approximately August of 1996, until in or about March of 1998, the Debtor's brother, Philip J. Oh ("Philip"), operated a check cashing business and maintained a bank account for this business at First Global Bank. The Debtor assisted Philip in setting up this business by obtaining a loan secured by his residence and giving the proceeds of that loan to his brother. After providing the loan proceeds to his brother and signing any documents that his brother asked him to sign in connection with obtaining the loan, the Debtor had no further involvement in the operation of his brother's check cashing business while it maintained a bank account at First Global Bank. The Debtor assumed that his brother's check cashing business was doing well during this period, as he did not hear or learn anything to the contrary.

In or about February or March of 1998, Philip told the Debtor that he wanted to open a bank account for his check cashing business at MBC in order to reduce the fees that he would be required to pay in connection with maintaining such an account. Philip told the Debtor that, in order for him to be able to open an account at MBC, he would need the Debtor to act as the owner of his check cashing business, because the Debtor had a better credit rating than his brother. Although the Debtor did not want to assist his brother in this endeavor, his mother prevailed upon him to do so, and the Debtor reluctantly agreed to do as his brother (and mother) had requested. The Debtor testified, however, that he never actually had any ownership interest in the check cashing business run by his brother, that he

---

der") supersedes the pleadings and includes a claim for relief under this section.

2. Pursuant to this Court's April 11, 2002 "Order Granting Motion for Provisional Relief from Discharge Injunction," this Memorandum adjudicates only whether any deficiency that may remain after MBC has applied its collateral in satisfaction of the Debtor's obligations is dischargeable in bankruptcy. It does not adjudicate the amount of any such deficiency. That amount has been or will be adjudicated in a separate action that MBC commenced in state court.

was not even a partner in the business, that he had no involvement of any kind in the business' day-to-day operations and that he merely "lent his name" to his brother's business to make the business appear more creditworthy to third parties.[3]

At his brother's request, the Debtor completed and signed a Fictitious Business Name Statement that was subsequently filed with the Orange County Recorder and given to MBC. (As the Debtor claims to speak and understand very little English,[4] the Debtor testified that he completed this form by copying from a sample form that had been prepared by Philip.) In that statement, the Debtor registers to do business as an individual under the fictitious name, "Jay Enterprise," at a business address that the Debtor testified is the address of his employer, California Union University, a Bible college in Fullerton. The residence address for the registrant on the statement is the Debtor's home. The Debtor understood that he was being asked to hold himself out to MBC as the owner of his brother's check cashing business, even though he really was not the owner of that business in any meaningful sense of the word.

The Debtor understood further that the reason for representing to MBC that he was the owner of his brother's business was that the Debtor was more creditworthy and had a more attractive balance sheet than his brother and that MBC would be relying on his financial condition and credit history in deciding whether or not to open a bank account for his brother's check cashing business. The Debtor also understood that MBC would need information on his assets and liabilities and provided Philip with copies of bank statements and other information for his brother's use in preparing a financial statement for MBC's review.

Among the bank statements that the Debtor provided to his brother were copies of statements that reflected funds that belonged to California Union University and not to the Debtor. The Debtor told Philip that these funds belonged to a nonprofit corporation and that he did not believe that MBC would consider these funds for the purpose of evaluating his financial condition, but Philip insisted on obtaining copies of these bank statements as well as the Debtor's personal bank statements, and the Debtor provided them.

In March of 1998, Matthew Roberts was employed as a vice president of MBC. His job duties included overseeing the operations of the cash management services division of the bank. In this capacity,

---

**3.** In the Pretrial Order, the Debtor neither admits nor denies that he is the owner of the business known as "Jay Enterprise." In the Debtor's post-trial brief, in an apparent effort to defeat MBC's claim for relief under section 523(a)(2)(A) by demonstrating that representations concerning ownership of the business were true, counsel for the Debtor asserts that the Debtor was indeed the owner of this business. *See Defendant's Post–Trial Brief,* p. 6 at lines 1–2. However, based on the Debtor's testimony on this issue, the Court finds that Jay Enterprise was not in fact a sole proprietorship owned by the Debtor. The Debtor signed the document necessary to register the fictitious name, "Jay Enterprise," for his use in connection with the operation of a sole proprietorship and became personally liable for the company's overdrafts at MBC by signing a Check Cashing Account Agreement, but he did not use this name to operate a sole proprietorship. His brother did. The Debtor did not maintain any of the typical indicia of ownership for a business. The Debtor did not receive any income or profits generated by the business. The Debtor did not have decision-making authority of any kind over any aspect of the business. The business was owned in all senses of the word by the Debtor's brother.

**4.** The Debtor testified at trial through a translator.

Matthew Roberts was responsible for operations and decisions of the bank concerning the opening, monitoring and maintenance of check cashing accounts.[5] The opening of a check cashing account presents certain unavoidable risks to a bank in light of the manner in which such an account is operated. Although checks are deposited into the account on a daily basis, the bank does not wait for those checks to clear the banks upon which they are drawn before permitting the account holder to withdraw funds from the account for use in the operation of its business. Instead, the bank issues a provisional credit for amounts deposited and permits the account holder to withdraw cash from the account immediately thereafter. If and when checks deposited later fail to clear the banks upon which they are drawn, the provisional credits given for returned items are reversed. As this may happen one to three or more days after the check has been deposited and money has been withdrawn from the account, the bank necessarily bears the risk that the account will become overdrawn when checks that have been deposited are returned for insufficient funds (or for other reasons) after the corresponding funds have been withdrawn from the check cashing account. As a result, the credit history of the account holder and his ability to make the bank whole in the event of an overdraft are critical factors that the bank evaluates in deciding whether to permit a new customer to open a check cashing account.

Matthew Roberts was the individual at MBC that made the decision to permit the Debtor to open a check cashing account at MBC. The Debtor was introduced to MBC and Matthew Roberts by Jay Lee, another check cashing customer of the bank of whom the bank thought highly, as someone who wanted to open a check cashing account at MBC for a new check cashing business. Although Jay Lee's English skills are also limited, Mr. Lee spoke and understood Korean and spoke and understood more English than the Debtor and therefore acted as a translator for the Debtor during the course of his discussions with Matthew Roberts.

The Debtor went to the bank on at least two occasions. During one of his trips to MBC, the Debtor signed and delivered to Matthew Roberts a number of documents, including the financial statement that was admitted into evidence as Plaintiff's Exhibit No. 3 (the "Financial Statement").[6] The Financial Statement is a package of five pages, the last two of which were signed by the Debtor. Matthew Roberts testified at trial, and Daniel Roberts testified during his deposition,[7] that these 5 pages would have been attached to one another,

---

5. The term, "check cashing account," as used in this Memorandum refers to a business account maintained by a check cashing business for the purpose of depositing and cashing checks that the business obtains from its customers.

6. Page 4 of the Financial Statement bears two signatures, one of which is that of the Debtor, the other of which purports to be that of the Debtor's wife. The Debtor testified at trial, however, that he signed both his own name and that of his wife in front of the bank officer and that he was told that it was permissible for him to do so.

7. Although MBC designated Daniel Roberts as one of its witness in the Pretrial Order and filed direct and reply declarations that set forth his testimony, Daniel Roberts did not attend the trial and was not available for cross-examination at that time. Accordingly, the Court did not permit MBC to introduce his declarations into evidence at trial. Nevertheless, his deposition testimony was admitted into evidence at the request of the Debtor as an admission of a party opponent.

either in booklet form or with a staple, at the time they were presented to a prospective customer for completion. The Debtor testified that he does know which documents he signed, as a number of documents were lined up, waiting for his signature when he arrived at the bank.

The Financial Statement contains a number of handwritten interlineations that were not initialed. None of the witnesses was able to identify the scrivener for these interlineations; however, Matthew Roberts explained that the purpose of the interlineations was to carryover from page 5, the real estate schedule, the value of the Debtor's real property and the correct amount of the real estate mortgage balances to the appropriate spaces on page 3 and to add to page 3 two obligations (Toyota Motor Credit and BofA Lease) that appeared on the Debtor's Equifax report but did not appear on the Financial Statement. The remainder of the interlineations were necessary to update the asset and liability totals to include the amount of these added items.[8]

Several items of information on the Financial Statement are false. On page 2 of Exhibit 3 (page 000007), the statement reflects cash on hand of $68,000, two bank accounts at California Korea Bank with balances of $12,500 and $59,000, respectively, and an account at Downey Savings and Loan with a balance of $8,000. Although he offered a number of possible explanations for the $68,000 of "Cash on Hand," the most reasonable interpretation of the Debtor's testimony with regard to this item is that he is not sure where that figure came from, but that it did not reflect any account that belonged to him.[9] With regard to the remaining three accounts, the Debtor testified that he never had any accounts at California Korea Bank and that the funds in these accounts belonged to his employer, California Union College, and not to him.

The Financial Statement, Exhibit 3, is also inaccurate, in that it reflects salaries for the Debtor and his wife that are inflated and ownership of a Ford Armored Truck, with a value of $30,000, that did not belong to the Debtor. With regard to the Schedule of Real Estate Owned, page 000010, the Debtor testified that the mortgage balance figures were fairly close to being accurate, but that he had no idea where the figure of $475 as the monthly cash flow came from and that he did not have any rental income from any property at the time the Financial Statement was prepared.

Sometime prior to the signing of the Financial Statement, MBC obtained a copy of the Debtor's Equifax report. The Debtor's Equifax report reflected a high Isaac score[10] and the Toyota and Bank of America obligations that were added by interlineation to page 3 of the Financial Statement. At some point prior to opening a

8. None of the handwritten changes materially affected the items on the Financial Statement that the plaintiff alleges are inaccurate.

9. Initially, the Debtor testified at trial that the $68,000 was the remainder of the funds that he had borrowed from First Global Bank and lent to his brother and that these funds belonged to Philip. However, at his 341(a) meeting, the Debtor testified that these were funds that belonged to his employer, California Union College.

10. The term, "Isaac score," refers to a score assigned in accordance with mathematical formulae developed by Fair Isaac and Company in an effort to predict the likelihood that a given borrower will repay credit extended. The higher the score, the lower the credit risk. These formulae take into account such factors as payment history, amount owed to various creditors, the length of the borrower's credit history, the amount of new credit extended to the borrower and the types of credit currently in use by the borrower.

check cashing account for Jay Enterprise, MBC also obtained copies of the Debtor's income tax returns for the prior three-year period. These tax returns reflected that the Debtor's income was lower than had been reflected on the Financial Statement, Exhibit 3. Matthew Roberts testified that, although he was aware of this inconsistency, MBC did not consider it significant, in light of the fact that the Debtor was starting a new check cashing business and might not receive any salary from his prior employment in any event.

MBC also conducted a site survey, which, as the Debtor planned to operate a mobile check cashing business, involved viewing and photographing the Debtor's armored vehicle. MBC did not run a search to determine who held title to the vehicle, but did look at the valuation that the Financial Statement had assigned to the vehicle and concluded that that value appeared reasonable in light of the cost of a new armored vehicle and the scarcity of used armored vehicles.

Matthew Roberts testified further that, in deciding to open a check cashing account for the Debtor, MBC relied on the information contained in the Financial Statement (other than the data concerning the Debtor's income), the Debtor's Equifax report and high Isaac score and the fact that the Debtor had been brought/referred to MBC by a good customer, Jay Lee. As Jay Enterprises was a new business without any track record, MBC requested a cash deposit to serve as security for overdrafts in the minimum amount required by the bank for this type of account ($15,000). Matthew Roberts testified that he anticipated that the amount of money that flowed through this check cashing account would start out relatively small and grow as the Debtor's business improved. MBC

did not establish any set overdraft limit for the account, as MBC wanted the account to maintain a positive balance at all times.

On or about March 18, 1998, MBC opened a check cashing account under the fictitious name, "Jay Enterprise." From that date until March 8, 1999, the Jay Enterprise account maintained a positive balance and MBC was unaware of any irregularities or problems with the account. As a result, until the account was identified as a potential problem on March 8, 1999, MBC did not review the individual checks that were deposited into the account to ensure that Jay Enterprise was complying with its obligations under the Check Cashing Agreement to refrain from depositing checks that were of high risk and to obtain California identification card or driver's license numbers for all depositors, and the Bank did not exercise its right to refuse to accept any checks for deposit that failed to comply with these requirements or to discontinue in whole or in part providing provisional credit for deposited checks and permitting immediate withdrawals of cash from the account. However, everything changed on March 8, 1999.

Matthew Roberts testified that, as the supervisor of the cash management services division of the bank, during this period, he received a report every morning concerning the bank's check cashing accounts. This report reflected such information as the balance in each account and the amount of deposits and withdrawals from the account. Although the report reflected a positive balance for the Jay Enterprise account on the morning of March 8, 1998, as an extraordinarily high amount of items were returned insufficient funds that day,[11] the situation changed.

11. MBC contends, and the Debtor does not dispute, that, at some point in early 1999,

Philip Oh began using the Jay Enterprise check cashing account at MBC to operate a

The account became overdrawn for the first time, and MBC stopped permitting cash withdrawals from the account.

From that point forward, MBC began inspecting all items deposited into the account and identified a number of checks that it considered to be of high risk (such as checks written to/being cashed by corporations and checks for amounts that were just slightly under $10,000). Although it considered a number of checks that were presented for deposit high risk, MBC ultimately deposited these items in the hope that some would clear and thereby reduce the amount of its overdraft. (MBC did not permit Jay Enterprises to withdraw additional cash in the corresponding amounts.) Matthew Roberts testified that, as a result of these later deposits, MBC succeeded in reducing its overdraft by approximately $300,000. As of March 31, 1999, the check cashing account of Jay Enterprise at MBC was overdrawn by more than $400,000.

Once it observed that the account was overdrawn, MBC applied the $15,000 certificate of deposit that it held as collateral and entered into discussions with the Debtor and Philip as to how they planned to repay the amounts overdrawn. These discussions eventually led to the execution of a Forbearance Agreement in which the Debtor and Philip agreed to make payments over time in reduction of the bank's loss. The Debtor's obligations under the Forbearance Agreement were secured by a deed of trust on his residence. The Forbearance Agreement does not contain any releases of any of the bank's rights as against the Debtor or Philip. To the contrary, paragraph 4 of the Forbearance Agreement states, in pertinent part, "Except as expressly modified by this Agreement, the Bank retains, without limitation, all remedies available to it by law."

## II

## CONCLUSIONS OF LAW

Although the parties may disagree on certain of the details, the operative facts of this case are not in dispute. The Debtor admits that, with his knowledge and consent, he was held out to MBC as the owner of Jay Enterprise, even though he actually held no ownership interest in the business. He admits further that his signature on the Financial Statement is authentic and that the Financial Statement contains material inaccuracies. The Debtor does not dispute that, when a bank opens a check cashing account and provides provisional credit to its depositor for checks that have not yet cleared the banks upon which they were drawn, the bank exposes itself to the very risks that led to the losses that occurred in the instant case. The Bank, for its part, has not disputed the Debtor's contentions that he speaks little or no English and did not review the Financial Statement before he signed it. Moreover, MBC does not dispute that it could have, but did not, conduct more investigation into the Debtor's financial condition prior to opening the Jay Enterprise check cashing account and that it might have prevented some or all of its losses if it had made a practice of reviewing the checks being deposited into the account before extending provisional credit and permitting cash withdrawals to be made from the account.

The parties do not agree, however, on the legal consequences that flow from the foregoing facts. The Debtor contends that MBC cannot establish the requisite degree of causation to state a claim for relief

---

check kiting scheme. The Debtor denies having had any knowledge of, involvement in or

benefit from, this scheme, and MBC has not attempted to prove to the contrary.

under section 523(a)(2)(A) or 523(a)(2)(B) because its losses resulted, not from fraud at the inception of the banking relationship, but from the independent criminal act of the Debtor's brother in which the Debtor was not involved[12] or from the bank's own failure to exercise the discretion that it reserved under the Check Cashing Agreement to refuse to accept high risk items for deposit. The Debtor contends further that MBC's reliance on the Financial Statement was not reasonable or justifiable, because MBC had received tax returns that were executed under penalty of perjury evidencing that the Debtor's income had been overstated on the Financial Statement, or that the bank should have conducted more due diligence before deciding to open the check cashing account. Lastly, the Debtor contends that the Debtor did not make any false representations to MBC, because all he did was sign documents without knowing or caring what he was signing.[13] The Court requested and obtained supplemental briefing by the parties on these issues and, based on its review of the relevant authorities, concludes that, on these facts, the plaintiff is entitled to judgment under sections 523(a)(2)(A) and 523(a)(2)(B), but not under section 523(a)(6).

## A. Plaintiff's Claims for Relief under Section 523(a)(2)(A)

In order to state a claim for relief under section 523(a)(2)(A), the plaintiff must establish by a preponderance of evidence[14] that: (1) the debtor made a representation; (2) the debtor knew at the time the representation was false; (3) the debtor made the representation with the intention or purpose of deceiving the creditor;

---

12. In its pretrial brief, MBC made clear that it did not intend to proceed against the Debtor on the theory that he and Philip were partners and, therefore, that Philip's actions should be imputed to the Debtor. Accordingly, the Court does not decide whether MBC has made the showing necessary to warrant such an imputation.

13. Initially, the Debtor asserted two additional defenses, but these appear to have been abandoned during the course of trial. To the extent that these defenses were not abandoned, they are hereby rejected. The first such defense was based on the Forbearance Agreement, but was never articulated in a way that either the Court or MBC could follow. The Forbearance Agreement does not contain releases of any kind. Thus, the Debtor did not argue that this agreement was a new transaction, or a novation, in which the bank waived the right to prosecute claims arising out of the prior sequence of events. If the Debtor's contention here is that MBC made the relevant credit decision at the time that it entered into the Forbearance Agreement, rather than at the time it opened the check cashing account, and that the Debtor did not make any false representations to the bank in connection with the execution of the Forbearance Agreement, the Debtor misstates the operative facts. Credit had already been extended to the Debtor based on false representations at the time the Forbearance Agreement was signed. Any steps that MBC may have taken thereafter in an effort to mitigate its losses have no impact on the viability of any claim for relief that it may have had against the Debtor for acts that had already occurred.

The second such defense was based on a theory of judicial estoppel. Here, the Debtor initially argued that, because MBC relied on certain facts in connection with its (successful) efforts to obtain summary judgment against the Debtor and his brother in its state court action, MBC was judicially estopped from pleading and proving contrary facts in the instant lawsuit. However, the Debtor never identified any contrary or inconsistent facts asserted by MBC in its state court action that MBC should be estopped to deny in this action. The bank does not dispute that Philip ran Jay Enterprise or that he was responsible for the check kiting scheme that led the Jay Enterprise account to become overdrawn, and these are not the facts upon which the Court's decision is based.

14. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

(4) the creditor relied on the representation; and (5) the creditor sustained damage as proximate result of the representation. *Apte v. Japra (In re Apte)*, 96 F.3d 1319 (9th Cir.1996). Moreover, as the Ninth Circuit explained in *Apte*, reliance by the creditor need only be *justifiable*, it need not be reasonable. A person is justified in relying upon a misrepresentation even if he might have ascertained the falsity of the information through investigation. Although one cannot close his eyes and rely blindly, mere negligence in failing to discover an intentional misrepresentation is no defense to fraud. *In re Eashai*, 87 F.3d 1082, 1090–91 (9th Cir.1996).

■ Further, when fraud involves an intentional failure to disclose material fact, positive proof of reliance is unnecessary. All that is necessary is that the facts withheld be material in the sense that a reasonable investigator might have considered them important in making his decision. The existence of an obligation to disclose and the withholding of material fact are enough to establish the element of causation. Nondisclosure of material fact in the face of a duty to disclose has been held to establish the requisite reliance and causation for actual fraud under the Bankruptcy Code. *In re Tallant*, 218 B.R. 58 (9th Cir. BAP 1999) (relying on *Apte*, 96 F.3d at 1323).

■ MBC has established all of the elements necessary to state a claim for relief under this section. The Debtor knowingly permitted himself to be held out to MBC as the owner of Jay Enterprise, even though he was not the owner of the business. He knew that his brother planned to represent to the bank that the Debtor, and not Philip, was the owner of the business, and the Debtor authorized him to do so. The Debtor signed and delivered, either directly to the bank or to Philip for the bank's use, the documents necessary to accomplish the deception. The Debtor understood that it was necessary for him to pretend to be the owner of the business because he had a better credit rating and was more creditworthy than Philip. He intended to induce MBC to believe falsely that he was the owner of the business. Although MBC might have discovered by hiring a translator and carefully questioning the Debtor that he was merely lending his name to his brother's business and that he would not have any actual ownership interest in the business, MBC was not required to do so. And a mere failure to discover true information, even if negligent, is no defense to fraud.

As the opening of a check cashing account is inherently risky, particularly where the depositor is a new business with no prior operating history, the character, credit history and creditworthiness of the prospective account holder are critical factors for the bank to assess in deciding whether or not to open the account. Matthew Roberts testified that MBC evaluated and relied on the Debtor's credit history and creditworthiness in making its decision to open this account, and the facts adduced at trial demonstrate that, but for the opening of this account, MBC would not have sustained the losses that gave rise to this action. Thus, MBC has made the showing necessary to obtain judgment under this section.

B. *Plaintiff's Claims for Relief under Section 523(a)(2)(B)*

■ The Debtor's liability to MBC is nondischargeable under section 523(a)(2)(B) as well. The elements necessary to state a claim for relief under this section are the same as those necessary to establish a claim under section 523(a)(2)(A), except that the false statement or statements must be in writing and must relate to the debtor's financial condi-

tion. In order to prevail, the plaintiff must establish by a preponderance of the evidence that: (1) the debtor made a material misrepresentation of fact; (2) he intended to deceive the creditor; (3) the debtor knew at the time that the representation was false; (4) the creditor reasonably relied on the representation; and (5) damage proximately resulted from the creditor's reliance on the representation. *Candland v. Ins. Co. of North America (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996) (citing with approval *In re Siriani*, 967 F.2d 302, 304 (9th Cir.1992)).

The Debtor does not dispute that the Financial Statement contained false information, including bank deposits that did not belong to the Debtor, income that the Debtor and his wife did not earn,[15] an armored vehicle that the Debtor did not own, and so on. The Debtor does not dispute that these misrepresentations were material and that MBC relied on this false information (other than information concerning his income) in deciding to open a check cashing account for Jay Enterprise. However, the Debtor does (or may) dispute that (1) MBC's reliance was reasonable, (2) the *Debtor* was the one who made the false representations to MBC, (3) the Debtor knew the representations were false at the time they were made and/or (4) MBC's damage was proximately caused by its reliance on these representations (rather than by the check kiting scheme run by Philip).

The Debtor's first argument fails as a defense to a claim brought under section 523(a)(2)(B) for the same reason that it failed as a defense to liability under section 523(a)(2)(A). The fact that MBC, if it so desired, might have performed a more thorough investigation or might have independently attempted to verify some or all of the information contained on the Financial Statement, and did not do so, does not give rise to a defense: "Lenders do not have to hire detectives before relying on borrower's financial statements...." *In re Gertsch*, 237 B.R. 160, 170 (9th Cir. BAP 1999). "A person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). Or, as the Ninth Circuit put it in *In re Lansford*, 822 F.2d 902, 904 (9th Cir.1987), "[H]aving intentionally misled the sellers in an area he knew was important to them, it is unseemly for Lansford now to argue that he should be excused from section 523 because the sellers believed him."

The fourth defense raised by the Debtor may be summarily dismissed as well. MBC testified, and the Debtor concedes, that opening a check cashing account is inherently risky, in that it subjects a bank to the risk that it will suffer a loss of exactly the kind that MBC suffered in this case, namely, that it will advance credit to the account holder for checks that subsequently fail to clear. But for the opening of the Jay Enterprise check cashing account, MBC would not have suffered this loss. Although MBC might have prevented this loss by carefully reviewing each check submitted for deposit before granting a provisional credit and permitting a cash withdrawal, MBC testified that it was not its practice to do this unless and until there were problems with a given account—which was not the case with re-

**15.** The Court is not relying on the falsity of this particular piece of information in finding for MBC on its claim for relief under section 523(a)(2)(B), however, as Matthew Roberts testified that the bank was aware that this information was inaccurate at the time it decided to open the account.

gard to the Jay Enterprise account until March 8, 1999, by which point, the bank had already advanced the credit that gave rise to its loss. The Debtor cannot escape liability under section 523(a)(2)(A) or (B) by demonstrating that MBC might have done something to prevent its loss. There is no "last clear chance" doctrine in the context of section 523.

This point is well illustrated by the Eleventh Circuit's holding in *Collins v. Palm Beach Savings & Loan (In re Collins)*, 946 F.2d 815 (11th Cir.1991), the reasoning of which case was cited with approval by the Ninth Circuit in *Siriani, supra*, at 306. In *Collins*, a borrower represented to a prospective lender (Palm Beach) that the collateral that he planned to provide to the lender had not previously been pledged or encumbered. This representative proved to be false, but the earlier lender to whom the collateral had already been pledged had failed to perfect its security interest. In reliance on this misrepresentation, the lender advanced funds and took a security interest in the collateral. By virtue of the earlier lender's failure to perfect, had Palm Beach perfected its security interest, it would have prevailed in a priority contest with the earlier lender. Therefore, the debtor in *Collins* argued that the requisite causation could not be established, because it was Palm Beach's failure to perfect its security interest, and not his misrepresentation, that had caused its loss. The Eleventh Circuit rejected this argument. In so doing, the Court explained,

> Although Palm Beach could have prevented its own injury by perfecting its interest in Collins's collateral property, the Bankruptcy Code does not require such diligence on the part of a creditor induced by fraudulent means in extending credit to a debtor.... If Collins had not made the false representations as to the status of his collateral property, Palm Beach would not have loaned Col-

lins $150,000. Therefore, we find no error in the bankruptcy court's finding that Collins's false statements were the proximate cause of Palm Beach's harm.

*Collins,* 946 F.2d at 816. This reasoning applies with equal force in the instant case. Although MBC might have avoided the loss that it suffered by carefully scrutinizing each check submitted for deposit and refusing to give a provisional credit and permit a cash withdrawal if an instrument appeared odd or suspicious, the Bankruptcy Code does not require such diligence on the part of the creditor. It is sufficient that, but for the false representations made on the Financial Statement, MBC would not have opened the Jay Enterprise check cashing account and, but for the opening of the account, MBC would not have suffered a loss. Thus, the misrepresentations that led to the opening of the check cashing account were the proximate cause of MBC's loss.

█ The two remaining defenses advanced by the Debtor are equally unavailing. Matthew Roberts testified that the Debtor signed the Financial Statement in his presence and gave it to him. The Debtor testified that, although he did not really know what he was signing, he signed both his name and that of his wife to the second to last page of the Financial Statement and that the purpose of his visit to the bank was to sign the documents that the bank wanted in connection with the opening of the Jay Enterprise account. Even if the Debtor had signed the Financial Statement in the privacy of his own home and had given it to his brother, because he knew that the intended recipient of the Financial Statement was the bank officer that would be evaluating whether or not to open the check cashing account, the Debtor can be charged with having made the representations contained on the Financial Statement.

Finally, the Debtor claims that he did not know the information contained on the Financial Statement was false, and, therefore, that a key element necessary to state a claim under section 523(a)(2)(B) cannot be satisfied, because he did not read the Financial Statement before signing it and did not speak English. However, the Debtor does not contend that he asked his brother or Jay Lee to translate the contents of the Financial Statement and that either gentleman lied to him about the contents of that document, leading him to believe that it was accurate. To the contrary, the Debtor testified that (1) he knew that MBC would be relying on his assets and his financial condition in deciding whether or not to open the check cashing account, (2) he understood that his brother was preparing documents that described his financial condition for MBC's review, (3) Philip insisted on obtaining, and did in fact obtain from the Debtor, in connection with his preparation of financial information for submission to MBC, copies of bank statements for accounts that did not belong to the Debtor and (4) the Debtor signed documents that were being submitted to the bank for its review in connection with the opening of the check cashing account. In light of this testimony, the Court finds that the Debtor must have known that one of the documents that he was signing was a document describing his financial condition, *i.e.*, a financial statement. On these facts, the Debtor cannot simply sign a document that purports to describe his own financial condition without reading it or questioning anyone as to its contents and then be held blameless if the statement contains materially false information. A creditor need not establish that the debtor had actual knowledge of the falsity of the representation in order to prevail under section 523(a)(2). He may satisfy this element of the required showing by proving that the false statement "was either knowingly made or made with sufficient recklessness so as to be fraudulent." *Alside Supply Center v. Aste (In re Aste)*, 129 B.R. 1012, 1017 (Bankr.D.Utah 1991).

In deciding whether a statement was made with the requisite level of recklessness, courts have examined such factors as whether the debtor could reasonably have been expected to have had access to the financial information contained on the statement and whether the debtor reasonably relied on the advice or services of an accounting professional in including the inaccurate information. In the *Aste* case, for example, the Court held that the required showing had not been made where (1) the financial statement in question was that of a corporation for which the debtor worked, (2) the debtor was not actively involved in the finances of the company and (3) there was nothing on the face of the financial statement that should have alerted him to its falsity. In light of these factors, the Court in *Aste* held that it was not reckless of the debtor to have relied on the accuracy of the financial information supplied by another corporate employee who had access to such information in signing the financial statement. *See also Ohio Casualty Ins. Co. v. Smith*, 158 B.R. 847 (Bankr.N.D.Okla.1993) (where (1) debtor had his accountant prepare the financial statement, (2) debtor knew that information on the financial statement had been taken directly from a compilation that he had provided to his accountant, (3) the figures contained in the compilation had been computed on a reasonable basis and (4) the debtor believed the numbers contained in the compilation were accurate and had relied on these figures in the conduct of his business, the debtor did not act with either the actual intent to deceive or with reckless disregard for the truth or falsity of the financial statement when he

signed the document without reviewing it or verifying the accuracy of the information that it contained).

On the other hand, when the debtor was in a position to have access to the financial information reflected on the statement and did little or nothing to review the financial statement before signing it to ensure its accuracy, or the debtor had reason to question the accuracy of the information contained in the statement, but failed to do so, courts have found the requisite level of recklessness. In *Foote & Davies v. Albanese (In re Albanese)*, 96 B.R. 376 (Bankr. M.D.Fla.1989), for example, when the debtor claimed that she had signed without reading a financial statement that inaccurately described her personal financial condition, the Court held that the requisite level of intent had been established: "The testimony of the Debtor that she did not read the personal financial statement is not worthy of belief. Regardless, even if the Debtor did, in fact, execute the forms without reading them, then without doubt she acted recklessly and negligently." *Albanese*, 96 B.R. at 380. *See also Teachers Service Org. v. Anderson (In re Anderson)*, 10 B.R. 607, 608 (Bankr. S.D.Fla.1981) ("The debtor is a well educated man with no physical or mental impairment. If, as he says, he did not read the application he signed, he acted with such reckless disregard that I must find that he acted fraudulently").

The Bankruptcy Appellate Panel's decision in *In re Coughlin*, 27 B.R. 632 (1st Cir. BAP 1983) provides yet another example. The debtor in *Coughlin* testified that a loan broker had prepared a loan application on his behalf for submission to a proposed lender without any input or information from the debtor. Not surprisingly, the figures reflected on the application for the debtor's assets and liabilities were completely inaccurate. The broker presented the debtor with a package of documents prepared by the broker for review and signature. Included in the package was the application that contained this false financial information. The debtor testified that he signed the loan application without reading it. Based on this record, the Court ruled that the requisite level of intent had been established: "A creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement by the debtor.... Intent to deceive is present when the debtor has 'seen the financial statement and the errors were such that he knew or should have known of their falsity.'" *Coughlin*, 27 B.R. at 636.

In the instant case, although the Debtor testified that he spoke little or no English, he had no difficulty at trial in deciphering numbers that appeared on the financial statement and could not have resided in the United States for as long as he has, obtained loans on his own or anyone else's behalf, made mortgage payments on his home, filed tax returns and the like without being able to recognize and understand the significance of the dollar figures that appeared on the Financial Statement. Although he might not have understood the accompanying text, he does understand the concept of a financial statement and did understand that a document concerning his financial condition was being prepared and submitted to the bank. If he had even glanced at page 3 of the Financial Statement, he would have noticed that it reflected a number of dollar values that did not correspond to anything that he owned and in one or more instances looked remarkably similar to the balances shown on the California Union College bank statements that he had given to Philip.

Moreover, the Debtor's testimony concerning his discussions with his brother

about funds on deposit that belonged to California Union College demonstrates his understanding of the difference between money that belonged to his employer and money that belonged to him. Philip's insistence on receiving copies of bank statements that the Debtor knew were irrelevant for the purpose of assessing the Debtor's own financial condition put the Debtor on notice that Philip planned to misrepresent to the bank that these funds belonged to the Debtor. Yet the Debtor did nothing to verify the accuracy of the Financial Statement. Instead, preferring to know as little as possible about a transaction in which he really did not want to participate, the Debtor simply signed whatever was put in front of him without any regard for its truth or falsity. A debtor cannot escape liability under section 523(a)(2)(B) by firmly putting his head in the sand and later claiming not to have known of the falsity of representations that were made on his behalf while his head was covered. Such conduct is sufficiently reckless to give rise to nondischargeable liability under section 523(a)(2)(B).

C. *Plaintiff's Claims for Relief under Section 523(a)(6)*

In order to impose liability under section 523(a)(6), the Court must find a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Debts or losses that arise from injury inflicted recklessly or negligently do not give rise to liability under section 523(a)(6). *Id.*

Stated differently, a debtor must either subjectively want to cause the injuries that the plaintiff suffered or subjectively believe that such injuries are substantially certain to result from his

conduct. *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202 (9th Cir.), *cert. denied,* 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001); *Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131 (9th Cir. BAP 2000). It is not sufficient that, viewed objectively, there was a substantial certainty that the debtor's conduct would cause harm. *Carrillo v. Su (In re Su),* 290 F.3d 1140 (9th Cir.2002). The undisputed evidence adduced at trial demonstrates that MBC cannot make the requisite showing.

The Debtor testified that he did not know how Philip's check cashing business had been doing while it maintained an account at First Global Bank, but that he assumed it had been doing well, as he had never heard to the contrary. He also testified that Philip had been making the monthly payments due on the loan that the Debtor had obtained on his behalf from First Global Bank. Nothing in the evidence presented at trial suggests that the Debtor had reason to know that Philip would participate in a check kiting scheme, leaving him to answer to the bank for the amount of the resulting overdraft. Nothing in the record establishes that the Debtor had reason to know that, if MBC opened a check cashing account for Jay Enterprise, MBC would be substantially certain to suffer injury. As far as the Debtor knew, Philip had not had any problems with his check cashing business in the past and wanted to move his account to MBC merely to save on bank fees and charges. Having made himself personally liable for the obligations of Philip's business, the Debtor had every reason to wish and hope that Philip's business went well and that the relationship between MBC and Jay Enterprise proved mutually beneficial. Thus, MBC's claim for relief under section 523(a)(6) must fail.

A separate final judgment consistent with this opinion, imposing nondischargeable liability on the Debtor pursuant to sections 523(a)(2)(A) and (a)(2)(B) for such deficiency amount as may be determined by the state court in the related state court action, shall be entered forthwith.