**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   SC-14-1150-KiKuJu |
| ) | |
| BIRGER GREG BACINO, ) | Bk. No.   09-20080-LT |
| ) | |
| Debtor. ) | Adv. No.   10-90315-LT |
| ) | |
| _____ ) | |
| ) | |
| BIRGER GREG BACINO, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION, as Receiver for ) | |
| La Jolla Bank FSB, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on January 22, 2015,
at Pasadena, California

Filed - December 31, 2015

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Laura S. Taylor, Chief Bankruptcy Judge, Presiding

Appearances:     John L. Smaha, Esq. of Smaha Law Group argued for
appellant Birger Greg Bacino; Duncan N. Stevens,
Esq. argued for appellee Federal Deposit Insurance
Corporation.

Before:   KIRSCHER, KURTZ and JURY, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8024-1.

Debtor Birger G. Bacino[2] appeals a judgment after trial determining that his debt to the Federal Deposit Insurance Company as Receiver for La Jolla Bank FSB ("the Bank"), was excepted from discharge under § 523(a)(2)(A)[3] and (a)(2)(B). Debtor also appeals a prior ruling granting in part the FDIC's motion for summary judgment and denying his cross-motion for summary judgment. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Background of Debtor's entities

Debtor successfully practiced law as a personal injury attorney, holding licenses to practice law in Texas (surrendered in 2006), California (surrendered in 2006) and the District of Columbia (suspended in 2010). Debtor also operated two real estate development entities: ALB Properties, Inc. of which he was 100% owner, and Barioni Lakes Estates, LLC, in which he held a 90% interest. These entities acquired residential lots in different stages of development including properties known as the Roxbury and the Imperial projects.

In 2002, Debtor also acquired an interest in a healthcare management conglomerate of several companies collectively called Premier. Prior to 2004, Premier was the largest provider of workers' compensation related healthcare services in the state of

---

[2] On September 28, 2015, Appellant's attorney notified the BAP that appellant died on August 7, 2015. Although the notification suggests that no state probate or other death proceeding will occur, the Panel issues this memorandum on the merits of the appeal, without considering issues of mootness.

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

California. Premier did not provide medical services directly, but facilitated patient care, billing, collection and therapeutical, translation and clinic support for doctors. Debtor also held a 100% interest in a company called Tammy, Inc. Tammy provided medical management services to Premier and provided legal management services to Debtor's law practice.

From 2003 through 2010, Premier and Debtor defended criminal and civil litigation by several governmental entities. In late 2004, sweeping changes were proposed in California's workers' compensation law. Premier decided to cease obtaining new lien claims secured by workers' compensation reimbursements and to focus on collecting its existing lien claims, which totaled approximately $400 million, and to defend against litigation related to those claims. In 2010, Debtor finally resolved the criminal claims against Premier by negotiating a plea agreement, wherein he waived all rights to the collection of Premier's receivables.

During the relevant time period, Debtor's ownership in Premier, Tammy and his law practice comprised his personal income and net worth. The management fees he anticipated Tammy would generate from collecting on Premier's receivables represented a significant portion of his represented 2004-2008 net worth, which he believed to be in excess of $300 million.

**B.    The loans with the Bank**

In 2004, an independent loan broker introduced Debtor to David Yoder, a loan officer and director of loan origination with the Bank. Yoder recommended to the Bank's loan committee that Debtor, who Yoder considered a highly desirable borrower, be given

three loans to fund the Roxbury project, which Yoder considered a favorable long-term investment. Yoder admitted the Bank actively recruited Debtor and his projects as a long-term customer for the Bank.

Between 2004-2008 Debtor, either individually or as the principal of ALB or Barioni, obtained eight loans from the Bank to fund the development projects and also entered into ten modifications and/or maturity date extensions of the existing loans. The loans and modifications totaled approximately $39 million; Debtor served either as a borrower or guarantor. The subject eighteen loans and modifications are as follows:

- Loan 21130 ("Loan 1") - 2004
- Loan 21197 ("Loan 2") - 2004
- Loan 20001 ("Loan 3") - 2004
- Modification of Loan 2 (21197) ("Loan 4") - 2005
- Modification of Loan 3 (21001) ("Loan 5") - 2005
- Loan 22090 ("Loan 6") - 2006
- Loan 00033 (also known as 22225) ("Loan 7") - 2006
- Loan 22354 ("Loan 8") - 2006
- First modification of Loan 6 (22090) ("Loan 9") - 2006
- First modification of Loan 1 (21130) ("Loan 10") - 2006
- Loan 00066 ("Loan 11") - 2006
- First modification of Loan 11 (00066) ("Loan 12") - 2007
- Modification of Loan 7 (00033) ("Loan 13") - 2007
- Loan 23203 ("Loan 14") - 2007
- Modification of Loan 8 (22354) ("Loan 15") - 2008
- Second modification of Loan 6 (00033) ("Loan 16") - 2008
- Second modification of Loan 11 (00066) ("Loan 17") - 2008

-4-

• Second modification of Loan 1 (21130) ("Loan 18") - 2008.

Ultimately, once the real estate market began its rapid decline in 2008-2009, Debtor defaulted on some of the loans. After 2009, the FDIC became the receiver of the Bank.

**C.    FDIC's nondischargeability action**

Debtor filed a chapter 7 bankruptcy case on December 31, 2009.  The FDIC filed its nondischargeability complaint on July 2, 2012, seeking relief under § 523(a)(2)(A) and (a)(2)(B).  The FDIC contended that Debtor had materially misrepresented his assets, income, net worth and liabilities in loan applications, personal financial statements ("PFS") and other documents submitted by him or on his behalf from his CPA, Warren Thefeld, on which the Bank relied for each of the loans and/or modifications.  Alternatively, the FDIC contended that Debtor intentionally misled the Bank by failing to disclose his true financial numbers and did so with the intent to deceive and induce the Bank to make loans or extend credit to Debtor on existing loans.

**1.    The cross-motions for summary judgment**

The parties later filed cross-motions for summary judgment. The FDIC sought summary judgment or partial adjudication on its § 523(a)(2)(B) claim ("MSJ"); Debtor sought summary judgment on both of the FDIC's claims, contending that it could not establish either reasonable or justifiable reliance ("Cross MSJ").

**a.    The FDIC's motion**

In the FDIC's initial brief in support of its MSJ, and to a greater extent in its supplemental brief ("FDIC's Supplemental

Brief"),[4] the FDIC alleged material misrepresentations and/or omissions by Debtor in connection with each of the loans and modifications; it set forth the evidence it believed supported nondischargeability of each particular loan or modification and stated whether such evidence was disputed or undisputed by Debtor.

### i. General allegations

As to all of the loans and modifications, the FDIC alleged:

(1) Debtor had continually misrepresented the value of Tammy at $25 million.

(2) In 2004, upon Thefeld's advice, Debtor set up a tax shelter via an Employee Stock Ownership Plan ("ESOP"), which allowed him to defer until retirement taxes on $25 million worth of income from Premier, ALB and his law practice. For the ESOP, an accrual of $25 million was recorded on Tammy's books and 2004 tax return. In essence, Debtor could collect the accrued $25 million in management fees from Tammy and not pay income tax because it had already been "paid" (deferred until retirement) in 2004. Approximately $12 million of the $25 million accrual was attributed to Debtor's income from Premier and his law practice; the other $13 million was attributed to Debtor's income from ALB.

(3) The $25 million accrual had no reasonable basis in accounting and created the fiction of overstated assets of both Tammy and ALB. By the end of 2008, only approximately $7.5 million of the $12 million related to Premier was collected. Thus, according to the FDIC, the accrual was overstated by 40%.

---

[4] This supplemental brief contains a chart of material facts and supporting facts and evidence and admissions as to whether a material fact was disputed or undisputed by Bacino.

At no time from 2004-2008 did Debtor ever disclose to the Bank that the Premier collections making up the value of Tammy were overvalued and that its value trended downward significantly from 2004-2008.

(4) The FDIC argued that Debtor had also inflated Tammy's value by not disclosing the Premier investigation and Workers Compensation Appellate Board ("WCAB") stay.

(5) The Bank had relied on Debtor's continued representation that Premier maintained accounts receivable totaling $300 million of which Tammy would realize an estimated $12 million in fees, when Debtor was aware as early as 2003 or 2004 that Premier's anticipated receivables were in jeopardy as being uncollectible due to its illegal activity and he never disclosed any of this information in writing to the Bank.

(6) Debtor had not disclosed that he knew as early as 2005 that a waiver of the Premier receivables could be a condition of a plea agreement.

(7) Debtor failed to inform the Bank in writing about the WCAB stay and the negative effect it had on Tammy's ability to collect the $300 million in Premier receivables.

(8) For each loan or modification, only Debtor knew about the investigation and the WCAB Stay, which were not readily discoverable by the Bank.

(9) Debtor understated his liabilities for each loan or modification by omitting ALB's $13 million loan from Tammy, costs of construction and, in some instances, the debt on his yacht. No loan application or PFS reflected the $13 million liability of ALB, which was never paid back. Tammy's valuation of $25 million

-7-

on the loan applications was based in part on ALB's loan receivable in favor of Tammy. Debtor applying the indebtedness of ALB to Tammy increased the value of Tammy's assets. However, by not balancing the asset with the corresponding liability, Debtor improperly inflated his net worth by $13 million.

(10) Debtor repeatedly omitted the costs of construction, which were listed on Debtor's tax returns for the years 2005 and 2006.

(11) Debtor consistently listed his yacht as having a value between $2.5 and $3.5 million, often without taking into account the $2.1 million owed against it. At deposition, Debtor could not explain why the yacht debt was not disclosed in some of the loan applications and PFSs.

(12) The Bank conformed with its standard practices in evaluating Debtor's credit worthiness by performing an underwriting analysis, credit check and property appraisal and by requesting tax returns, balance sheets, profit & loss statements, bank statements and information from Thefeld, Debtor's CPA, to explain the complex financial structure of Debtor's entities.

**ii. Evidence supporting each loan or modification**

In addition to the general paraphrased allegations noted above, the FDIC provided evidence to support nondischargeability of the eighteen transactions individually, which consisted of the following:

**Loans funded in 2004** - Loan 1, Loan 2, Loan 3. The Bank funded these three loans on November 3, 2004, in the amounts of $4,184,500, $1,850,000 and $1,850,000 respectively. Because the Bank funded these loans together, the FDIC's evidence in support

-8-

of its claim was essentially the same. Debtor admitted inaccuracies existed in the loan applications submitted to the Bank, and his expert, Walter Schiller, opined that the financial information Debtor provided to the Bank contained "glaring errors from the very first loan."

In the applications submitted for these loans, dated October 31, 2004, Debtor represented his monthly income as $57,512 or approximately $690,000 per year. The FDIC contended this statement was a misrepresentation because Debtor's 2004 income tax return showed an annual income of only $270,000.

Debtor also represented that his net worth was $49,908,015, reflecting total assets of $56,440,038 minus total liabilities of $6,532,023. The $49 million net worth figure included $32 million in "Net worth of business(es) owned." Before these loans were funded, the Bank requested verification "to support [Debtor's] stated $32.0 million business net worth figure, which is in addition to his 100% real estate interests shown on his real estate schedule." In response, Thefeld provided the Bank with a Tammy Statement of Income for 2003 in which management fees were identified as $30,027,345.64. Thefeld also provided the Bank with a 2003 Tammy Balance Sheet identifying total assets of $30,027,299.80, which included an accounts receivable of $29,696,239.02. To substantiate Tammy's value for 2004, Thefeld provided the Bank with a Tammy Profit & Loss Statement from January through August 2004 identifying income of $7,483,215.62 in management fees. At deposition, Thefeld testified that Tammy was worth $29 million in 2004, which included the accrued $25 million receivable based on anticipated income from ALB and the management

-9-

fees from collecting the Premier receivables.

In addition, Debtor prepared for the Bank a memorandum, entitled "Tammy, Inc. receivables through Premier Medical" (the "Tammy Memorandum"), wherein he represented that "[t]he $305 million in accounts receivable may be collected at 50%, which would mean that my share would be 35% of $150 million. . . . This year, Tammy can expect to collect $150 million times 20% (collection rate) times 35%, which is my share or 10 million. This amount is a bit more then [sic] past years, as my share was around 8 million."

Based on the expert opinion of Robert Wallace, the FDIC contended Debtor's identified net worth constituted a misrepresentation as it was based on the overstated value of Tammy, resulting from the accrual of unrealized management fees. Of the $25 million accrued for 2004, which made up the majority of Debtor's stated business net worth of $32 million, only $7.5 million was actually collected between 2004 and 2008. The FDIC further contended Debtor was engaging in "double accounting" of the same asset wherein the same money was represented as (1) monthly base income from Tammy and his law practice and (2) a Tammy asset of $25 million.

The FDIC contended that Debtor had also misrepresented his liabilities by identifying one of the Roxbury lots with a value of $8 million and a debt of $552,000. Debtor admitted this was an error; the debt was actually $5.5 million.

The FDIC also contended that the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced in the Underwriting Analysis for each of the three loans, which

-10-

stated:  "Mr. Bacino is a self-employed attorney and real estate investor, with an est. $49.9 million net worth and earnings in excess of $706,000 per year."  The Bank's reliance on Debtor's net worth was also demonstrated by the Bank's Credit Memorandums generated for Loan 2 and Loan 3, which stated:  "Net worth — $38,521,892 . . .  Strengths:  Strong Guarantor Net Worth."

**Loans funded in 2005** — Loans 4 & 5.  Loan 4 was a modification of Loan 2, wherein Debtor received an additional $1,440,000; Loan 5 was a modification of Loan 3, wherein Debtor received an additional $390,000.  These loans were funded on August 12, 2005.  In addition to Debtor's submitted loan applications, Thefeld had also submitted to the Bank a letter dated August 11, 2005 (the "August 2005 Letter"), which discussed Debtor's and Tammy's income.  It stated:  "My firm is the accountant for Greg Bacino. . . .  His adjusted gross income on his 1040 for 2004 will be approximately $3,300,000.  In addition, approximately $25,000,000 of additional income was earned and will be reported as income by his ESOP pension plan."

In the applications for these loans dated June 15, 2005, Debtor represented his monthly income was $600,000, or $7.2 million per year.  The FDIC contended this was a misrepresentation because Debtor testified that he did not recall making $600,000 per month in 2006 and Thefeld, who did Debtor's taxes, corroborated that Debtor did not personally earn that much money. Thefeld estimated that Debtor's income could have been no greater than $300,000 per month.  Further, contended the FDIC, Debtor had improperly "double counted" the Tammy asset because any income from Tammy and his law practice had already been identified as

-11-

part of the $25 million accrual and could not be considered "income" in the subsequent years when actually collected.

As for his alleged net worth misrepresentations, in the application for Loan 4, Debtor represented total assets of $65,895,349, including $32 million in "Net worth of business(es) owned" and $32,300,000 in "Real estate owned." In the application for Loan 5, dated the same date, Debtor represented total assets of $71,175,318, including $32 million in "Net worth of business(es) owned" and $35 million in real estate. Besides the $5.2 million discrepancy in the asset figure between the two applications, Wallace opined that Debtor had also misrepresented his net worth due to his overstated value of Tammy and his double accounting of that asset. The FDIC contended that Debtor had also misrepresented his liabilities. Neither loan application identified any debts, which Debtor could not explain.

The FDIC argued the Bank relied on Debtor's representations of income, assets and net worth as demonstrated by the Underwriting Analysis for each loan, which stated: "He has a net worth in excess of $2.9 million which consists of approximately $35 million in real estate owned, $32 million in net worth of business and $1.25 million in personal property." The Bank's reliance on Debtor's stated net worth figure of $71 million, which reflects the lack of any debts, was also demonstrated by the Credit Memorandum generated for each loan, which stated: "Bacino Net Worth $71,175,318 & Liquidity $2,925,318. Recommend file for approval." Based on the expert opinion of Thomas Tarter, the FDIC contended it was reasonable and customary for the Bank to rely on Thefeld's August 2005 Letter in extending additional credit to

-12-

Debtor because of Thefeld's status as a CPA.

**Loans funded in 2006** — Loan 6. The Bank funded Loan 6 for $8,075,000 on February 15, 2006. In connection with this loan, Thefeld authored a letter dated February 6, 2006 (the "February 6, 2006 Letter") to Jim Fardeen of Merrill Lynch, which was ultimately submitted to the Bank. It stated: "The following is a brief summary of the income tax structure of Greg's Entities . . . . [Premier's] [a]ccounts receivable are in excess of $300,000,000 and are considered collectible by Greg. . . . The cash net income in 2004 was over $5,000,000. Greg has estimated that his future Premier collections from January 2006 forward will total $12,000,000-15,000,000. . . . The estimated income for the law firm for 2005 is $900,000."

In the application submitted for Loan 6 dated February 8, 2006, Debtor represented his monthly income was $600,000. The FDIC contended this was a misrepresentation because Debtor's 2006 personal income tax return reflected that his salary and wages were $0.

Debtor represented his net worth of $64,835,604, reflecting total assets of $86,435,773 minus liabilities of $21,600,169. Debtor represented his assets included $32 million in "Net worth of business(es) owned" and $33,750,000 in real estate. As with prior loans, Wallace opined that Debtor had misrepresented his net worth due to his overstated value of Tammy and his double accounting of that asset. Debtor had also failed to list various debts of ALB and Barioni.

The FDIC contended that the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced in

-13-

the Underwriting Analysis: "Mr. Bacino has a stated net worth of $64,835,604. This is comprised mainly of equity originating from his business (approx. $32 million) and his real estate investments (approx. $22 million). . . . Strengths: Guarantor's net worth." Tarter opined that it was reasonable and customary for the Bank to rely on Thefeld's February 6, 2006 Letter in extending credit to Debtor for Loan 6. The FDIC argued that it was also reasonable for the Bank to rely on the updated financials for Tammy: the 2005 Tammy Balance Sheet showed accounts receivable of $25,840,521; and the Tammy 2005 Profit & Loss Statement listed management fees of $2,075,263.

Loan 7. The Bank funded Loan 7 on March 10, 2006, for $3 million. On February 22, 2006, Debtor authored a letter for the Bank discussing his and Tammy's income (the "February 22, 2006 Letter"). Debtor represented that "Tammy, Inc. has accrued and paid tax on $25 million in income. Even though Tammy is entitled to accrue $25 million, the pension amount will be regulated by existing pension laws. In excess of $12 million has already been run through Tammy's qualified ESOP and been invested into ALB Properties."

In Debtor's PFS dated November 15, 2005, Debtor represented total income of $7.4 million, which consisted of $900,000 from his law practice, $4 million from ALB and $2.5 million from Tammy. The FDIC contended these figures misrepresented Debtor's income. Schiller opined that Debtor's stated total income, which was the same amount he represented in every PFS, was not substantiated by any document. Thefeld, who did Debtor's tax returns, suspected Debtor was not making $900,000 annually and admitted that Debtor's

-14-

income from Tammy and his law practice was substantially reduced from 2005-2008, but was never reflected in any PFS. The FDIC also disputed Debtor's asserted $2.5 million income for Tammy; Tammy's 2006 tax return showed an income of only $652,000. The FDIC contended this reported $2.5 million income was also an improper "double counting," when the Tammy asset was already part of the $25 million accrual. Finally, the FDIC disputed Debtor's asserted $4 million income for ALB; ALB made no money in 2006.

In the loan application Debtor submitted for Loan 7 dated March 9, 2006, Debtor represented a $600,000 monthly income. This statement, however, argued the FDIC, contradicted Debtor's 2006 income tax return, which showed his income as $0.

In the November 15, 2005 PFS, Debtor represented total assets of $124,691,730, including $84,050,000 in owned real estate, $5.5 million in his law practice, $25 million in Tammy and $2.5 million in his yacht. In the March 9, 2006 loan application, Debtor represented total assets of $96,778,117, including $1,020,509 in "Net worth of business(es) owned," $33,750,000 in real estate and $11 million in vested interest in his retirement fund (the ESOP). The FDIC contended that Debtor had engaged in "triple accounting" of the Tammy asset wherein the same money was represented as (1) $600,000 monthly based income, (2) an $11 million vested retirement plan, and (3) Tammy equity of $32-33 million. Debtor admitted at deposition that this appeared to be true.

The FDIC argued the Bank's reliance on Debtor's representations of income, assets and net worth was demonstrated by the Underwriting Analysis: "Overall credit summary: Total

-15-

Assets: $96,778,117; Total Liabilities: $22,760,452; Net Worth: $74,017,665. . . . Mr. Bacino's net worth is $74,017,665. This is comprised mainly of equity originating from his various business ventures (approx. $47.5 million). . . . Mr. Bacino's financial statements also reflect $11 million in retirement reserves[.] . . . The borrower high debt ratios are partially offset by the borrower's sizable expected income from accounts receivable held in his qualified ESOP's. The receivables are estimated to be around $16.6 million over the next few years." The FDIC contended the Bank's reliance on Debtor's net worth was also demonstrated by the Credit Memorandum generated for Loan 7: "Mr. Bacino has a stated Net Worth of $74,077,162. . . . Strengths: The borrower has strong Net Worth, Repeat Borrower, Guarantor has consistent Strong Net Income. . . . Based on the financial strength of the borrower and guarantor, approval is recommended."

Additionally, the FDIC argued that in funding Loan 7 it was reasonable for the Bank to rely on (1) the Tammy Memorandum, (2) a recent February 2006 Tammy Balance Sheet, which listed accounts receivable as $25,840,521 and contained the same double accounting error, (3) an updated 2005 Tammy Profit & Loss Statement, which stated management fees of $2,705,263, but failed to disclose this "income" was an asset and technically not income because it was already taxed in 2004, (4) the February 6, 2006 Letter wherein Thefeld represented accounts receivable were in excess of $300 million and considered collectible by Debtor and that future Premier collections would total $12-15 million, and (5) Debtor's February 22, 2006 Letter.

Loan 8. The Bank funded Loan 8 on June 29, 2006, in the amount of $2,015,000. For reasons unexplained, two loan applications both dated June 21, 2006, were submitted for this loan. In the first loan application, Debtor represented his personal monthly income was $600,000. As noted with prior loan applications, the FDIC contended this was a misrepresentation as Debtor never made $600,000 per month between the years 2004 and 2008 and his 2006 tax return showed his salary and wages as $0. Further, any income claimed to be derived from Tammy was an improper double accounting.

The FDIC contended that Debtor had also misrepresented his net worth. In the first loan application Debtor represented total assets of $71,848,587, including $32 million in "Net worth of business(es) owned," $5.5 million in real estate and $31,730,000 in "other assets," which included the Imperial property valued at $26,280,000. In the second loan application, Debtor represented total assets of $116,855,820, which reflects a difference of over $45 million from the first application. During Debtor's deposition taken on October 13, 2010, and as confirmed in the FDIC's Supplemental Brief, Doc. No. 362, Fact 379, Debtor doubted the figures presented in the second loan application were accurate.

Debtor represented his total liabilities in the first application as $5,071,917 and in the second as $12,946,674. Regardless of the figure, the FDIC contended he understated his liabilities based on the general allegations as to all of the transactions noted above. Debtor had also failed to disclose various debts of ALB and Barioni.

-17-

The FDIC contended that the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced in the Credit Memorandum, which stated: "Net Worth: His stated net worth is in excess of $66.77 million. This consists of $32.0 million in net worth of business owned . . . . "Mitigating factors supporting approval of the loan, include guarantor's net worth in excess of $66.77 million and guarantors' real estate investing experience." As with Loan 7, the FDIC argued that in funding Loan 8 it was reasonable for the Bank to rely on misrepresentations made in the Tammy Memorandum, the February 2006 Tammy Balance Sheet, the 2005 Tammy Profit & Loss Statement, Thefeld's February 6, 2006 Letter and Debtor's February 22, 2006 Letter.

Loan 9. Loan 9 was the first modification of Loan 6, wherein Debtor received an additional $2,513,400. It was funded on or around August 1, 2006. It appears from the record provided in support of the FDIC's MSJ that Debtor did not submit a loan application or a PFS for this loan. Nonetheless, the FDIC claimed that based on statements made by the Bank in the related Credit Memorandum, the Bank relied on Debtor's misrepresentations of income, assets and net worth. In that Memorandum, the Bank stated Debtor's net worth was "in excess of $36.1 million." "Strengths: Net Worth is in excess of $36.1 million," and "Weakness: Mr. Bacino's 2003 Federal Income Tax Returns reflect income loss - Offset with Net-Worth in excess of $36 million." The documents the FDIC claimed supported the Bank's reliance for funding Loan 9 included (1) the Tammy Memorandum, (2) an updated July 2006 Tammy Balance Sheet, which showed receivables of $25,840,521, (3) the

-18-

2005 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, and (5) Debtor's February 22, 2006 Letter.

Loan 10. Loan 10 was the first modification of Loan 1, wherein Debtor received an additional $1 million. It was funded on August 11, 2006. It also appears that Debtor did not submit a loan application for this loan. Although the FDIC's MSJ referenced Exhibit 109 as the loan application, Exhibit 109 was the loan application for Loan 7 funded in March 2006. The FDIC did contend, however, that for this loan the Bank relied on Debtor's misrepresentations regarding his income, liabilities and net worth in his PFS from November 15, 2005. Because Loan 7 was also supported in part by this same PFS, the FDIC presented essentially the same evidence to support its claim for nondischargeability for Loan 10.

The FDIC contended the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced by its statement made in the Underwriting Analysis for this loan, which is identical to what was stated in the Underwriting Analysis for the original loan funded in November 2004: "Mr. Bacino is a self-employed attorney and real estate investor, with an est. $49.9 million net worth and earnings in excess of $706,000 per year." The other documents the FDIC claimed supported the Bank's reliance for funding Loan 10 included (1) the Tammy Memorandum, (2) the July 2006 Tammy Balance Sheet, (3) the 2005 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, and (5) Debtor's February 22, 2006 Letter.

Loan 11. Loan 11 was funded on December 20, 2006, for $1 million. Again, two loan applications were submitted for this

loan. In the first loan application dated November 20, 2006, Debtor represented his monthly income was $57,512, including $36,787 of "partnership income." The second application dated December 13, 2006, indicated that Debtor's monthly income was $616,666, including $208,333 from Tammy. Besides the discrepancy in monthly income between the two applications, the FDIC argued that Debtor had misrepresented his income because his 2006 tax return identified his salary and wages as $0.

Debtor's recent PFS dated November 10, 2006, reflected his total income as $7.4 million, which consisted of $900,000 from his law practice, $4 million from ALB and $2.5 million from Tammy. The FDIC contended these figures were also misrepresentations of Debtor's income for the same reasons it stated in Loan 7.

As for his assets, the first loan application stated total assets of $56,440,038, including $23,500,000 in real estate and $32 million in "Net worth of business(es) owned." The second loan application represented total assets of $123,201,232. Thus, a $66 million discrepancy in assets existed between the two applications dated just weeks apart.

The FDIC contended the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced by the Credit Memorandum, which stated that the loan's weaknesses were "mitigated by the guarantor's real estate experience, PIQ locations and guarantor's net worth in excess of $82.28 million." The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, which showed receivables of $25,840,521, (3) an updated 2006 Tammy Profit & Loss Statement, which listed

management fees of $2,345,842.63, but still contained the same double accounting error, (4) Thefeld's February 6, 2006 Letter, and (5) Debtor's February 22, 2006 Letter.

**Loans funded in 2007** — Loan 12. Loan 12 was the first modification of Loan 11, wherein Debtor received an additional $1,224,500. It was funded on March 1, 2007. In the submitted PFS dated February 14, 2007, Debtor represented total income of $7.4 million, which consisted of $900,000 from his law practice, $4 million from ALB and $2.5 million from Tammy. Schiller opined that Debtor's represented income of $7.4 million was not substantiated by any document and neither was the purported $2.5 million income from Tammy. The FDIC contended the Tammy income was a misrepresentation because the 2007 Tammy tax return showed an income of $619,000. The FDIC contended Debtor also misrepresented the $4 million ALB income; the 2007 ALB tax return showed an income of -$2,966,734. Schiller opined that nowhere did Debtor ever report $4 million in income from ALB to the IRS.

In the loan application dated February 14, 2007, Debtor represented his personal monthly income as $616,666, including $208,000 from Tammy. The FDIC contended this was a misrepresentation of Debtor's income because his 2007 tax return showed his salary and wages as $0. As for Tammy income, Debtor had admitted at deposition that he did not know of any income of $208,000 per month, even if the application had been considering collection of the Premier receivable, which was not the amount collected in 2007. The FDIC contended that Debtor's representation of "rental income" for $333,333 was also incorrect; Debtor testified he had no rental income. Debtor's employee,

-21-

Anne Berens, testified that many of these numbers were simply carried over from prior years.

In the February 14, 2007 PFS, Debtor represented assets totaling $124,867,868, including real estate at $90,050,000, law practice at $5.5 million, Tammy at $25 million and the yacht at $2.5 million. In the loan application, Debtor represented assets totaling $123,337,295, including $4,050,000 in real estate, $86 million in "Bus. Re Owned" and $25 million in Tammy. As with prior loans, Wallace opined that Debtor had misrepresented his net worth due to his overstated value of Tammy and his double accounting of that asset.

The FDIC contended the Bank's reliance on Debtor's representations of income, assets and net worth was demonstrated by the Credit Memorandum: "Stated Net Worth: $67.517MM which is largely made up of partnership and real estate equity interest. . . . Strength: High Net Worth of Guarantor." The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, (3) the 2006 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, and (5) Debtor's February 22, 2006 Letter.

Loan 13. Loan 13 was a modification of Loan 7, wherein Debtor received an additional $3 million. It was funded on May 10, 2007. As additional collateral, Debtor pledged 350 shares of Premier stock, valued at $6 million. On May 4, 2007, Thefeld had authored another letter to the Bank on Debtor's behalf, which provided updated information regarding the receivables (the "May 4, 2007 Letter"). Thefeld represented that the $25 million

accrual had been decreased by collections, of which Tammy was estimated to still receive $19.1 million.

As with Loan 12, Debtor had submitted for Loan 13 the PFS dated February 14, 2007, which the FDIC contended contained the same misrepresentation of his monthly income, assets and liabilities. In the loan application dated May 9, 2007, Debtor represented his personal monthly income was $616,666. The FDIC contended this was also a misrepresentation of Debtor's income because his 2007 tax return showed his salary and wages as $0.

The FDIC contended the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced by the Underwriting Analysis, which discussed the receivables details in Thefeld's May 4, 2007 Letter, noted Debtor's net worth of "$85,619,103," and stated that one of the strengths for Loan 13 was the "Strong Net Worth of Borrower." The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, (3) the 2006 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, (5) Debtor's February 22, 2006 Letter, and (6) Thefeld's May 4, 2007 Letter.

Loan 14. The Bank funded Loan 14 for $2.54 million on December 31, 2007. Loan 14 was paid in full by a title insurance company, but the FDIC sought nondischargeability of any litigation fees that might be incurred in a future adverse ruling.

In a recent PFS dated December 18, 2007, Debtor represented his total income was $7.4 million, which consisted of $900,000 from his law practice, $4 million from ALB and $2.5 million from Tammy. The FDIC presented the same evidence for why these income

-23-

figures were misrepresentations as it did for Loan 12.

In the loan application dated December 28, 2007, Debtor represented his total monthly income as $121,083, which equates to $1,452,996 million annually. The FDIC contended this was another misrepresentation of Debtor's income because his 2007 tax return identified his salary and wages of $0.

The FDIC also pointed to inconsistencies regarding Debtor's net worth in the PFS dated December 18, 2007, and the loan application dated December 28, 2007. The PFS stated that assets totaled $141,497,000, including real estate at $117,497,000, law practice at $5.5 million, Tammy at $15 million and the yacht at $3.5 million. The loan application stated assets totaling $96,648,115, including "$0" in real estate, $5.5 million in "Net worth of business(es) owned," $72,631,295 in "Net LLC Equity," $15 million in Tammy and $3.5 million in the yacht. As with prior loans, the FDIC contended Debtor had misrepresented his net worth based on Wallace's opinion that Debtor had overstated the value of Tammy and double accounted for that asset. The FDIC contended that Debtor had also misrepresented his liabilities by stating in the PFS they totaled $57,065,705, but stating in the loan application they totaled only $6,140,409.

The FDIC contended that the Bank's reliance on Debtor's representations of income, assets and net worth was demonstrated by the Underwriting Analysis, which stated that Debtor had "a stated net worth of $90.5 million. This is comprised largely of $72.6 million in net partnership and LLC real estate equity[.]" . . . "Sources of Repayment: Guarantor/Borrower's other real estate, LLC income and/or liquidation of a portion of

-24-

$90.5 million net worth."  The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, (3) the 2006 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, (5) Debtor's February 22, 2006 Letter and (6) Thefeld's May 4, 2007 Letter.

**Loans funded in 2008** - Loan 15.  Loan 15 was an assumption of Loan 8 from one of Debtor's entities to another.  No new funds were advanced in this transaction occurring on January 7, 2008.

Loan 16.  Loan 16 was a second modification of Loan 6.  It was funded on April 11, 2008, wherein Debtor received an additional $1.6 million.

In the submitted PFS dated April 10, 2008, Debtor represented total income of $7.4 million, which consisted of $900,000 from his law practice, $4 million from ALB and $2.5 million from Tammy. The FDIC contended the Tammy income was a misrepresentation because the 2008 Tammy tax return showed an income of $102,713. Thefeld had also confirmed that Debtor's law firm income in 2008 was $170,542, not the $900,000 represented in the PFS.  The FDIC contended Debtor also misrepresented the $4 million ALB income; the 2008 ALB tax return showed an income of -$13 million.

In the loan application dated April 10, 2008, Debtor represented his personal monthly income was $121,083, including $40,078 listed as "other" without explanation.  The FDIC contended this statement was an additional misrepresentation in Debtor's income because Debtor's 2008 tax return identified his total income as -$2,361,183.

The FDIC also noted the inconsistencies regarding Debtor's

-25-

net worth in the PFS and loan application, both dated April 10, 2008. In the PFS, Debtor represented total assets of $141,347,000, including $5.5 million for his law practice, $15 million for Tammy and $3.5 million for the yacht. The loan application stated Debtor's assets totaled $94,437,323, including "$0" in real estate, $5.5 million in "Net worth of business(es) owned," $70,631,295 in "Net LLC Equity," $15 million in Tammy and $3.5 million in the yacht. Debtor claimed his net worth was $82,821,399, based on his liabilities of $11,615,924. A Borrower/Guarantor Analysis created by the Bank for Loan 16 reflects Debtor's net worth was $82,821,399. The FDIC contended that Debtor also misrepresented his liabilities, which he stated in the PFS totaled $59,265,705, but stated in the loan application they totaled $11,615,924.

The FDIC contended the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced in the Underwriting Analysis, which indicated the "Strong Net Worth of Borrower." The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, (3) an updated 2007 Tammy Profit & Loss Statement, which listed management fees of $1,578,679.18, but still contained the same double accounting error, and (4) Thefeld's May 4, 2007 Letter.

Loan 17. Loan 17 was a second modification of Loan 11, wherein Debtor received an additional $1.2 million. It was funded on September 19, 2008.

In the PFS dated May 12, 2008, Debtor represented his total income was $7.4 million, which consisted of $900,000 from his law

-26-

practice, $4 million from ALB and $2.5 million from Tammy.  The FDIC presented the same evidence for why these income figures were misrepresentations as it did for Loans 12 and 14.

In the loan application dated September 18, 2008, Debtor represented his personal monthly income was $616,666, which included $333,333 in rental income Debtor admitted did not exist. See FDIC's Supplemental Brief, Doc. No. 362, Facts 684-687.  The FDIC contended this was a misrepresentation of Debtor's income because his 2008 tax return showed his total income was -$2,361,183.

The FDIC also noted significant inconsistencies regarding Debtor's net worth in the PFS dated May 12, 2008, and the loan application dated September 18, 2008.  The PFS stated assets totaling $141,347,000, including real estate owned at $117,497,000, his law practice at $5.5 million, Tammy at $15 million and the yacht at $3.5 million.  The loan application stated assets totaling $77,286,040, including "$0" in real estate, $5.5 million in "Net worth of business(es) owned," $53,248,205 in "Net LLC Equity," $15 million in Tammy and $3.5 million in the yacht.

The FDIC contended that the Bank's reliance on Debtor's representations of income, assets and net worth was evidenced in the Underwriting Analysis for Loan 17:  "The guarantor's Net Worth is $67.517 MM made up largely from partnership interest and real estate equity."  The Bank's reliance was also evidenced in the generated Credit Memorandum, which referenced Debtor's stated $67.517 million net worth and stated that the "High Net Worth of Guarantor" was a strength for the loan and something that overcame

-27-

its weaknesses. The FDIC further contended it was reasonable for the Bank to also rely on (1) the Tammy Memorandum, (2) the February 2006 Tammy Balance Sheet, (3) the 2007 Tammy Profit & Loss Statement and (4) Thefeld's May 4, 2007 Letter.

Loan 18. Loan 18 was the second modification of Loan 1. However, this transaction on July 1, 2008, was only a maturity date extension of Loan 1 and no additional funds were advanced. At any rate, it appears that Debtor did not submit a loan application or a PFS in connection with this transaction. The Tarter report also shows the absence of these documents. Nonetheless, the FDIC claimed that based on statements made in the Bank's related Underwriting Analysis, Credit Memorandum and Borrower/Guarantor Analysis, the Bank relied on Debtor's representations of income, assets and net worth to issue the extension. The Underwriting Analysis stated: "The guarantor's Net Worth is $67.5MM made up largely from partnership interest and real estate equity." The Borrower/Guarantor Analysis referenced the $67.5 million net worth figure and stated that "Greg Bacino reports stated income of $75,000/month in legal fees, $208,333 monthly average in net income from Tammy, Inc., and a monthly average of $333,333 in ALB Properties, LLC net real estate income." Finally, in the Credit Memorandum, the Bank referenced Debtor's net worth of $67.5 million and stated that a strength for the extension was the "High Net Worth of Guarantor."

### b. Debtor's Cross MSJ

In short, Debtor argued the FDIC had failed to show: (1) he made any misrepresentations to the Bank with the intent to deceive; (2) that the Bank justifiably relied on any material

-28-

representation within the context of § 523(a)(2)(A); (3) that the Bank reasonably relied on any written statements provided by Debtor; or (4) that any discernable damages were caused by his alleged representations. Debtor's Cross MSJ was supported by 92 exhibits and the declarations of Debtor, Yoder and his expert Schiller.

As part of Debtor's defense that the Bank could not have reasonably relied on his written representations, Schiller opined that the loan applications and PFSs Debtor submitted to the Bank contained "glaring" errors, at least 250 of them, which should have sent up red flags in the Bank's underwriting department that further investigations and inquiry were needed. Debtor also alleged that the Bank, not he, created some of the loan applications. Yoder declared that the Bank's underwriting and loan processing departments were "relatively weak," that the "individuals did not seem to understand large loans, project depth, the need of bonds, or complexity in the development process in general." Yoder also believed the Bank's underwriting staff "were not properly trained in sophisticated scenarios to review batch financials and comparisons."

In reviewing each of the transactions, Schiller opined that the Bank failed to meet the standard of care in issuing the various loans and modifications or extensions. Specifically, Schiller opined that the Bank's files were cumulative, so the errors and omissions in the first loans "tainted" subsequent loan files. Therefore, for the Bank to solely rely on subsequent loan files and ignore prior loan files was commercially unreasonable and a breach of the standard of care. Schiller also opined that

-29-

the Bank erred by relying solely on what he called "company prepared" material, the least reliable type of underwriting information, particularly when loaning approximately $50 million. Instead, the Bank should have required audited and certified material. In sum, Schiller opined that due to the Bank's zeal to compete in the hot real estate market, it "basically overlooked submitted financial information with glaring discrepancies and inconsistencies that they never should have accepted without further extensive evaluation."

As for the Bank's claim under § 523(a)(2)(A), Debtor contended that to support the first element of representation, the representation had to be one of "an existing or past fact." Debtor contended that at the time the loans and modifications were executed, he made no representation of an existing or past fact, only "opinions" as to values. And, in any event, these opinions all related to his "financial condition," which was not actionable under § 523(a)(2)(A). Further, the Bank could not show justifiable reliance on any omissions by Debtor in his written statements.

The crux of Debtor's opposition to the FDIC's MSJ was that it lacked any affidavits or declarations of material facts from Bank personnel affirming: (1) what the Bank relied upon; (2) what the Bank's purported "standard practices" were; and (3) whether any efforts were made to verify the financial information Debtor provided, especially when clearly inconsistent information was within the loan files.

**2.    The ruling on the cross-motions for summary judgment**

The bankruptcy court held a hearing on the MSJ and Cross MSJ

-30-

on January 31, 2013. The court agreed with Debtor's counsel that for purposes of summary judgment, it would have to review each loan or modification on a loan-by-loan basis and the evidence that purported to support nondischargeability of each loan or modification.

In its order entered on March 11, 2014, and in substantial conformance with its tentative ruling issued just prior to the hearing, the bankruptcy court granted the FDIC partial summary judgment as to its § 523(a)(2)(B) claim and denied Debtor's Cross MSJ in its entirety ("MSJ Order"). The court found that, absent evidence to the contrary from Debtor, the Bank had provided Debtor with money or an extension of credit based on a written representation of fact as to Debtor's financial condition or that of his insider for all transactions, except Loan 15 which was an assumption and Loan 18 which was an extension of time. Thus, the first element for a claim under § 523(a)(2)(B) was met as to the sixteen other transactions and summary judgment was appropriate.

The court also granted summary judgment to the FDIC as to the material falsity of Debtor's representations. In his defense to reasonable reliance, Debtor had conceded the numerous inaccuracies in his written financial information relating to the loans and modifications. Further, the court found that the transactions involved loans supported by Debtor's guaranty, and that Debtor's (and his insiders') financial information was necessarily required and material to the transactions as a result. Thus, the second element for a claim under § 523(a)(2)(B) was met as to all transactions.

The court also granted summary judgment to the FDIC as to

-31-

actual reliance for all transactions. The court found that the documents Debtor provided were typical for any loan, and Debtor did not dispute that the Bank relied on them. Yoder's declaration failed to suggest that any of the particular documents submitted were not necessarily relied upon by the Bank to some extent in its decision to lend. Further, Debtor in his responses to the FDIC's statements of uncontroverted facts prepared in support of the FDIC's MSJ failed to dispute statements establishing actual reliance by the Bank. See FDIC's Supplemental Brief, Doc. No. 362. Thus, the fourth element for a claim under § 523(a)(2)(B) was met as to all transactions.

Finally, the court found that the Bank's reliance was reasonable as to the initial loans — Loan 1, Loan 2 and Loan 3. Neither Debtor nor Schiller addressed why Loan 1 would have raised red flags such that the Bank could not reasonably assume the information presented by, or on behalf of, Debtor was accurate. Schiller did not even discuss Loan 1; Debtor did not directly discuss it. As for Loan 2 and Loan 3, the court found that Schiller's declaration contained only minimal assertions; it concluded that the "scintilla" of evidence he raised was not sufficient to create a triable issue as to whether reasonable reliance existed for these three loans. Thus, Debtor had not sufficiently rebutted the FDIC's evidence. Therefore, the fifth element for a claim under § 523(a)(2)(B) was met as to Loan 1, Loan 2 and Loan 3, but triable issues of material fact existed as to the Bank's reasonable reliance on Loans 4 through 18.

The court denied summary judgment as to Debtor's actual intent on all transactions, but noted that state of mind could be

-32-

established by recklessness. Here, Debtor's own evidence showed he delegated responsibility for preparation and presentation of his financial information and made little, if any, effort to ensure the Bank received accurate financial information. The court opined that Debtor's conduct could support a recklessness finding, but it was not going to grant summary judgment on that issue.

The court also denied summary judgment as to damages. In short, it believed that a trial was necessary to determine whether reasonable reliance existed in connection with the transactions where it had not already found otherwise. Further, the FDIC still had to prove proximate cause. Thus, damages, if any, were not yet determinable.

**3.    The trial on the FDIC's nondischargeability action**

With summary judgment having been granted in part to the FDIC, the remaining issues of intent, reasonable reliance, causation and damages for its claim under § 523(a)(2)(B) were tried, as well as all issues for its claim under § 523(a)(2)(A). Trial briefs were filed both before and after the trial. The trial took fourteen days, twelve witnesses testified and approximately 1000 exhibits were entered into evidence.

The bankruptcy court entered a written decision on February 28, 2014. It found in favor of the FDIC as to the remaining elements for its claim under § 523(a)(2)(B) and as to all elements for its claim under § 523(a)(2)(A). A judgment was entered on March 17, 2014, determining that the Bank's debt of $14,724,003.80 was nondischargeable under both § 523(a)(2)(A) and (a)(2)(B). Debtor timely appealed the judgment on March 31, 2014.

-33-

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err in denying Debtor summary judgment?

2. Did the bankruptcy court err in determining that the debts to the Bank were excepted from discharge under § 523(a)(2)(B)?

3. Did the bankruptcy court err in determining that the debts to the Bank were excepted from discharge under § 523(a)(2)(A)?

## IV. STANDARDS OF REVIEW

We review summary judgment determinations de novo. See Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(internal quotation marks omitted). Under this standard, the moving party is entitled to summary judgment if the nonmoving party "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.; see also Ilko v. Cal. State Bd. of Equalization (In re Ilko), 651 F.3d 1049, 1052 (9th Cir. 2011)(applying Celotex summary judgment standard to bankruptcy adversary proceeding). As explained in Celotex, all other facts are immaterial when the

-34-

nonmoving party fails to submit sufficient proof of an essential element of its case. Id. at 323.

In reviewing a bankruptcy court's determination of an exception to discharge, we review its findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009). For purposes of § 523(a)(2), a debtor's intent, materiality, whether the creditor relied upon the debtor's false statements and proximate cause are all questions of fact we review under the clearly erroneous standard. Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996). A factual finding is clearly erroneous if it is illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). We give great deference to the bankruptcy court's findings when they are based on its determinations as to the credibility of witnesses. Id.

"We may affirm 'on any ground supported by the record, regardless of whether the [bankruptcy] court relied upon, rejected, or even considered that ground.'" Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014) (citation omitted).

## V. DISCUSSION

When determining whether a debt is excepted from discharge, a bankruptcy court must construe the evidence against the creditor and in favor of the debtor. Mele v. Mele (In re Mele), 501 B.R. 357, 363 (9th Cir. BAP 2013). A creditor objecting to dischargeability of its claim bears the burden of proving, by a preponderance of the evidence, that the particular debt falls

-35-

within one of the exceptions to discharge enumerated under § 523(a). Grogan v. Garner, 498 U.S. 279, 286-291 (1991).

Debtor contends the bankruptcy court erred by "lumping" the loans and modifications together and not trying the case on a loan-by-loan basis. Debtor contends he was denied due process because each of the eighteen separate transactions were not tried as separate debts. Debtor fails to point out in the record where he made this due process objection. Further, in reviewing the trial transcripts, it is clear the court tried the case on a loan-by-loan basis. In fact, Debtor's counsel complained at the end of trial day 7 that the FDIC was taking far too much time with testimony on each of the transactions individually. In response to his complaint, both the FDIC and the court reminded Debtor's counsel that he was the one arguing in favor of that very approach at summary judgment. Nonetheless, we agree that the bankruptcy court took a "global" approach in its decision. As we discuss in more detail below, this caused it to err as to at least two of the loans.

**A. The bankruptcy court erred in determining that Loan 9 and Loan 10 were excepted from discharge under § 523(a)(2)(B), but correctly determined that the other transactions were excepted from discharge under § 523(a)(2)(B).**

To prevail on an exception to discharge claim under § 523(a)(2)(B),[5] the creditor must show: (1) it provided debtor

_____

[5] Section 523(a)(2)(B) provides:

(a) A discharge under . . . this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . (B) use of a
(continued...)

-36-

with money, property, services or credit based on a written representation of fact by the debtor as to the debtor's financial condition; (2) the representation was materially false; (3) the debtor knew the representation was false when made; (4) the debtor made the representation with the intention of deceiving the creditor; (5) the creditor relied on the representation; (6) the creditor's reliance was reasonable; and (7) damage proximately resulted from the representation. See In re Candland, 90 F.3d at 1469; Siriani v. Nw. Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992); Gertsch v. Johnson & Johnson (In re Gertsch), 237 B.R. 160, 167 (9th Cir. BAP 1999) (adopting the elements required under the companion section 523(a)(2)(A), with the additional and obvious requirement that the alleged fraud stem from a false statement in writing).

**1.      There must be a statement in writing respecting the debtor's or insider's financial condition that contains a false representation of fact.**

The bankruptcy court determined on summary judgment that, absent contrary evidence from Debtor, the Bank had provided Debtor with money or an extension of credit based on a written representation of fact as to his or his insider's financial condition for all transactions, except for Loans 15 and 18. The court reiterated this finding again in its written decision after trial, but it is not clear whether it intended to still exclude

[5](...continued)
statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]

-37-

these loans. Debtor does not raise this issue on appeal. However, we conclude that Loan 9 and Loan 10, both of which were modifications of loans to ALB, were not supported by a "written representation of fact" as to Debtor's "financial condition," and Debtor should have been granted summary judgment with respect to these two loans under § 523(a)(2)(B).

A loan application containing information about an applicant's income constitutes a statement in writing respecting the applicant's financial condition for purposes of § 523(a)(2)(B). See Cashco Fin. Servs. v. McGee (In re McGee), 359 B.R. 764, 768 (9th Cir. BAP 2006). The same would be true for a personal financial statement. The Panel examined the meaning of the term "financial condition" as it is used in § 523(a)(2)(B) in Barnes v. Belice (In re Belice), 461 B.R. 564, 578 (9th Cir. BAP 2011), and held that it must be interpreted narrowly:

> Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities . . . . What is important is not the formality of the statement, but the information contained within it — information as to the debtor's or insider's overall net worth or overall income flow.

Id. at 578. In other words, the writing must be a complete or comprehensive statement regarding a debtor's income and expenses. Id. at 579.

No loan application or PFS was submitted for Loan 9. This is clear from the FDIC's MSJ and the Tarter and Wallace reports. Wallace did not discuss this loan at all; Tarter's report shows that no application or PFS were submitted for it. The record also

-38-

indicates that Debtor did not submit a loan application for Loan 10, which is also reflected in the MSJ. Tarter and Wallace failed to address this loan at all in their reports. Although the FDIC's MSJ referenced a PFS it claims was submitted with Loan 10, it cited to the wrong document.

The other documents the FDIC claimed supported the Bank's reliance for funding both loans included (1) the Tammy Memorandum, (2) a July 2006 Tammy Balance Sheet, (3) the 2005 Tammy Profit & Loss Statement, (4) Thefeld's February 6, 2006 Letter, and (5) Debtor's February 22, 2006 Letter. The Tammy Memorandum discusses only Debtor's potential income he would derive from Tammy. The July 2006 Tammy Balance Sheet again shows only the financial health of Tammy, not Debtor's overall financial health. Plus, these loans were to ALB, not Tammy. The same is true with the 2005 Tammy Profit & Loss Statement. The February 6, 2006 Letter seems more akin to a statement of Debtor's net worth or overall financial health, but the focus is still primarily on his income only; it did not discuss any of his liabilities. Finally, the February 22, 2006 Letter discusses briefly the Tammy accrual, the ESOP and what properties ALB owns and is developing and estimated sales figures.

While each of these alleged misrepresentations reflect some aspect of Debtor's income and the profitability of his entities, "they do not either separately or when taken together reflect his overall cash flow situation, his overall income and expenses, or the relative values and amounts of his assets and liabilities." In re Belice, 461 B.R. at 579. Accordingly, without a "written representation of fact" as to Debtor's financial condition with

-39-

respect to Loan 9 and Loan 10, the bankruptcy court erred in denying summary judgment to Debtor for these loans under § 523(a)(2)(B).  However, they may still be nondischargeable under § 523(a)(2)(A).

As for the remaining loans (with the exception of Loan 15 and Loan 18), the bankruptcy court did not err in finding that the Bank provided Debtor with money or an extension of credit based on a written representation of fact as to Debtor's or an insider's financial condition.  Debtor submitted loan applications and/or PFSs with each of the remaining loans, and Debtor does not dispute that each contained significant falsity.

**2.  The misrepresentation must be material.**

A materially false statement is one which "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally effect [sic] the decision to grant credit."  First Interstate Bank of Nev. v. Greene (In re Greene), 96 B.R. 279, 283 (9th Cir. BAP 1989)(citations omitted).  "'Material falsity' in a financial statement can be premised upon the inclusion of false information or upon the omission of information about a debtor's financial condition."  Id.  See also N. Park Credit v. Harmer (In re Harmer), 61 B.R. 1, 5 (Bankr. D. Utah 1984)(a "long line of cases" has held that in a financial statement, the "omission, concealment, or understatement of any of the debtor's liabilities constitutes a 'materially false' statement.")(citing cases).  "A statement can be materially false if it includes information which is 'substantially inaccurate' and is of the type that would affect the creditor's decision making process."  In re Greene, 96 B.R. at

-40-

283 (citations omitted). See In re Candland, 90 F.3d at 1470 (adopting Greene standard for "material falsity" and holding that "significant misrepresentations of financial condition — of the order of several hundred thousand dollars — are of the type which would generally affect a lender's or guarantor's decision").

In its summary judgment ruling, the bankruptcy court found in favor of the FDIC on this element as to all of the transactions. After trial, relying on Candland, it again found in favor of the FDIC, determining the inaccuracies in the loan applications and PFSs were material and of the type the Bank actually relied upon in making the decision to advance the loans. In addition, the court found that Debtor's omitted information — his resignation from two state bars in 2006, the Premier investigation and the WCAB Stay — was of the type that would be material to the Bank, because it reflected on Debtor's character, which Tarter opined was one of the "5 C's" for obtaining credit. This finding is consistent with Greene, as material falsity can also be established by omissions of information about a debtor's financial condition.

Debtor contends the bankruptcy court applied an improper standard for material falsity under § 523(a)(2)(B) at summary judgment and after trial. He argues, essentially, that we ignore controlling case law and adopt the standard set forth in Matter of Bogstad, 779 F.2d 370, 375-376 (7th Cir. 1985). In Bogstad, the Seventh Circuit held that for a statement to be materially false for purposes of § 523(a)(2)(B), the test is whether the lender would have made the loan had he known of the debtor's true financial condition. That is not the standard in the Ninth

-41-

Circuit. In fact, the Candland court expressly rejected Bogstad and adopted this Panel's standard for material falsity set forth in Greene. Candland, 90 F.3d at 1470.

More concerning is that Debtor's counsel agreed with the bankruptcy court during the summary judgment hearing that the standard it applied for material falsity was the correct one:

> MR. SMAHA: So to the extent that we're saying yes, there are numbers on here that would be of the type that a bank would be interested in, and that they relied on those numbers, I don't have any problem with that concept.
>
> . . . .
>
> THE COURT: I'm saying pretty much for all loans, I think there are misstatements of a type that a bank would rely on.
>
> MR. SMAHA: I would agree with that --
>
> THE COURT: All transactions.
>
> MR. SMAHA: I believe that would be a true statement, and we would probably -- we would admit to that.
>
> . . . .
>
> MR. SMAHA: But yes, we agree that they relied on all the documents that were provided by Mr. Bacino.

Hr'g Tr. (Jan. 31, 2013) 31:14-17, 32:10-16, 34:22-23. Thus, it would appear Debtor has waived any argument on this issue. In any event, we conclude the bankruptcy court applied the correct standard for material falsity.

**3. Debtor knew the misrepresentation at the time to be false and the debtor made it with the intention of deceiving the creditor.**

The bankruptcy court did not find actual intent to deceive, but did find that Debtor had acted with the requisite recklessness to establish his intent under § 523(a)(2)(B), whether applying either a "gross" recklessness standard or some lesser form. Mem.

-42-

Decision (Feb. 28, 2014) 20-21.  Specifically, the court found that Debtor borrowed or guaranteed millions of dollars through the use of documents that were highly inaccurate.  They presented a false sense of his personal net worth.  Id. at 21.  They failed to disclose facts known to Debtor that created a significant risk to him and to anyone relying on him for repayment.  He delegated responsibility for truthful disclosure to others who lacked the information, opportunity or sophistication to provide an accurate picture of his financial condition, and he did so repeatedly.  Although Debtor testified that he read the documents prior to the closings of the various loans, the court found that no evidence existed "that he corrected a single syllable."  Id.

Debtor contends the bankruptcy court applied an incorrect standard for intent.  He contends that in light of Bullock, none of the exceptions to discharge under § 523(a) can be satisfied with a showing of "mere negligence."  See Bullock v. BankChampaign, N.A., 133 S.Ct. 1754 (2013).  The bankruptcy court did not make a finding of "mere negligence" or apply any such standard, which is not the standard in this circuit at any rate.  In this circuit, reckless disregard for the truth of a representation or reckless indifference to the debtor's actual circumstances can support a finding of intent for purposes of § 523(a)(2).  See Anastas v. Am. Sav. Bank (In re Anastas), 94 F.3d 1280, 1286 (9th Cir. 1996); In re Gertsch, 237 B.R. at 167-68 (applying the reckless standard to § 523(a)(2)(B)); Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm), 175 B.R. 349, 354 (9th Cir. BAP 1994).  The bankruptcy court may consider circumstantial evidence that tends to establish what the debtor

-43-

must have actually known when taking the injury-producing action. Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir. 2005).

In Bullock, the Supreme Court held that the intent requirement for a fiduciary's defalcation should be the same as the other specifically enumerated acts found in § 523(a)(4) — i.e., larceny and embezzlement. 133 S.Ct. at 1759. An innocent defalcation does not suffice. The fiduciary's conduct requires intentional, improper conduct and "reckless conduct of the kind that the criminal law often treats as the equivalent." Id. Accordingly, where actual knowledge is lacking, intent can still be shown for purposes of § 523(a)(4) if the "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." Id. at 1759-60 (quoting Model Penal Code § 2.02(c)).

We disagree that Bullock applies to § 523(a)(2)(B), or if it does, that the standard set forth in Bullock has heightened the standard of recklessness already applied in this circuit. In any event, we perceive no clear error in the bankruptcy court's finding that Debtor's actions here satisfy the standard of gross recklessness. Debtor admitted delegating the responsibility for preparing PFSs and loan applications to his employees, Berens and Judy Brenning, who often signed for him, and relying heavily on them for providing the correct information. Berens, who began filling out the PFSs and loan applications in early 2007, testified that generally she carried numbers over from prior documents, with Debtor's knowledge, that she did not verify

-44-

Debtor's income figures and that she believed it was Debtor's responsibility to verify whether the numbers were true and correct. Brenning admitted that in filling out the first PFS she had "no idea what to do" and had to consult with Thefeld. Brenning testified that she relied on Debtor or Thefeld for much of the financial information contained in later PFSs and loan applications; she had no knowledge of what the numbers were on her own.

Debtor testified he also relied heavily on Thefeld for correct information in the PFSs and loan applications. However, Thefeld testified that other than assisting Brenning with some information for the first loans, he never discussed with Debtor or any of his staff financial information for PFSs or loan applications. Although Debtor testified that he "glanced" at every loan application at the Bank's Escondido office before submitting them, he also testified that he did not think he needed to review them because he had a "super team." Berens also testified that it would not be unusual for Debtor to ask her to sign his name to a PFS without him reviewing it.

Clearly, many of the facts contained in the PFSs and loan applications were not accurate. And it appears Debtor did little if anything to ensure that they contained accurate information before signing or submitting them. Failure to review documents containing false statements about a debtor's financial condition, with the knowledge that those documents will be submitted to obtain money or credit, supports a finding of reckless disregard. Merchs. Bank of Cal. v. Oh (In re Oh), 278 B.R. 844, 858 (Bankr. C.D. Cal. 2002). The bankruptcy court did not find Debtor's

-45-

testimony credible that he believed his staff could submit accurate and complete information without his input. Mem. Decision (Feb.28, 2014) 9:16-28. We must give this credibility finding great deference. In re Retz, 606 F.3d at 1196. Accordingly, the bankruptcy court applied the correct standard for intent; we conclude its finding against Debtor on that element was not clearly erroneous.

**4. Creditor must reasonably rely on the misrepresentation.**

To meet the reliance standard under § 523(a)(2)(B), there must be reasonable reliance. Reasonable reliance means reliance that would have been reasonable to a hypothetical average person. Heritage Pac. Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 736 (9th Cir. BAP 2012). Reasonable reliance is analyzed under a "prudent person" test. In re McGee, 359 B.R. at 774; First Mut. Sales Fin. v. Cacciatori (In re Cacciatori), 465 B.R. 545, 555 (Bankr. C.D. Cal. 2012)(court must objectively assess the circumstances to determine if creditor exercised degree of care expected from a reasonably cautious person in the same business transaction under similar circumstances). Reasonable reliance is judged in light of the totality of the circumstances on a case-by-case basis. In re Machuca, 483 B.R. at 736.

A creditor's reliance may be reasonable if the creditor adhered to its normal business practices. In re Gertsch, 237 B.R. at 172. The court may consider whether the lender's normal practices align with industry standards, or if any "red flags" exist that would alert a reasonably prudent lender to consider whether the representations relied on were inaccurate. Nat'l City Bank v. Hill (In re Hill), 2008 WL 2227359, at *3 (Bankr. N.D.

-46-

Cal. May 23, 2008)(citing Ins. Co. of N.A. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir. 1995)).  A creditor cannot simply ignore red flags that directly call into question the truth of the statements on which the creditor claims to have relied. In re Machuca, 483 B.R. 736-37 (citing In re McGee, 359 B.R. at 775).  Under such circumstances, the creditor must support reasonable reliance with evidence explaining why it was reasonable for it to rely on the statements notwithstanding the red flags. Id.  However, when the evidence shows materially false statements were made by the debtor, little investigation is required by the creditor to have reasonably relied on the debtor's representation. In re Gertsch, 237 B.R. at 170.

The bankruptcy court found that the Bank actually and reasonably relied on the erroneous and incomplete information provided by Debtor.  Mem. Decision (Feb. 28, 2014) 21-24.  Debtor disputes this finding of fact, which we review for clear error. In short, Debtor contends that because the Bank did its own income analysis, it did not actually rely on the stated income numbers. He further contends the Bank took no action on the discrepancies that were actually noted by personnel.  In other words, the numerous "red flags" at issue precluded the Bank's reasonable reliance on Debtor's misrepresentations.

The bankruptcy court agreed with Debtor that the Bank apparently did discover some of his errors, such as those identifiable from credit reports, and utilized its own information in connection with the lending decisions.  Mem. Decision (Feb. 28, 2014) 22.  The court also agreed that had the discoverable errors been the only ones out there, Debtor would have had a defense.

-47-

However, they were not. Debtor failed to disclose a host of transactions requiring disclosure that were not readily discoverable by the Bank. These transactions included loans between his various entities ($13 million ALB loan from Tammy) and several private loans from Berens ($300,000), her brother ($75,000), Fish ($6-8 million), and Jerry Hall, the father of the Bank's president (amount unknown). Id. Debtor had also failed to disclose that he was no longer licensed to practice law in Texas and California. And, what the court found most troubling, Debtor failed to disclose the serious challenges, ultimately leading to criminal liability, that faced Premier.

The bankruptcy court rejected Debtor's defense that the Bank did not rely on his net worth but rather on the development projects. First, the Bank required a guaranty, which provided a source of repayment if the projects did not generate sufficient proceeds and which was consistent with its general practice and industry standards. Further, the Underwriting Analyses and Credit Memoranda consistently pointed to Debtor's net worth as support for the loans. Due to Debtor's erroneous information, his net worth and liquidity were not as represented in the documents he signed. While the Bank discovered some of these errors and reduced its estimate of net worth accordingly, the court found that the Bank could not find all of them through any reasonable means. The intercompany and private loans would not show up on a credit report; the Premier issues were also undiscoverable with any reasonable due diligence.

Finally, the bankruptcy court disagreed with Debtor's "red flag" argument, supported by Schiller. The court found that the

-48-

FDIC established through Tarter, and through factual testimony, that the Bank could reasonably rely on Debtor's submissions, even if it identified serious errors. The errors identified still resulted in a conclusion that Debtor had significant net worth. No alerts existed that led to the discovery of the many loans and transactions that would never be disclosed by a balance sheet, or the serious problems with Premier. The court also found compelling that Debtor and his entities were repeat customers, and that Debtor's legal training could reasonably lead the Bank to conclude he was sophisticated and aware of his obligations for full disclosure.

We see nothing illogical, implausible or without support in the record as to the bankruptcy court's finding that the Bank actually and reasonably relied on Debtor's misrepresentations. The loan approval documents generated by the Bank clearly show its actual reliance on Debtor's misrepresentations by its repeated references to his significant, yet overstated, net worth. And, contrary to Debtor's argument, his misrepresentations went far beyond his income. With the exception of Loan 9 and Loan 10 (and Loan 18), Debtor continually overstated his assets and understated his liabilities on each loan application and PFS submitted to the Bank. Further, as established by the FDIC's experts, the Bank adhered to industry standards and took reasonable measures to verify Debtor's representations. This adherence, along with the Bank's inability to discover the omitted and significant intercompany and private loans and Debtor's failure to disclose the Premier problems, supports a finding of reasonable reliance. Due to Debtor's many materially false statements, the Bank was

only required to perform a minimal investigation, which it did. In re Gertsch, 237 B.R. at 170.

### 5. Creditor suffered damages proximately resulting from the debtor's misrepresentation.

The bankruptcy court held that based on the totality of the evidence, the FDIC had met its burden of proof that losses sustained were the proximate result of Debtor's actions. The court rejected Debtor's argument that the FDIC failed to introduce testimony from a loan officer stating what the Bank would have done had it known. No such testimony was required; Debtor failed to offer this same type of testimony favorable to his cause when the burden of proof shifted to him given the standard articulated in Siriani and Candland.

In Siriani, the Ninth Circuit held that in the case of credit renewals, "a creditor seeking nondischargeability under section 523(a)(2)(B) must show that it had valuable collection remedies at the time it agreed to renew its commitment to the debtor, and that those remedies later became worthless." 967 F.2d at 305. Stated another way, where credit renewals are involved, the creditor must show some proximately-caused damage beyond the unpaid debt. The bankruptcy court did not address this part of Siriani's holding. Instead, it relied on Siriani's directive that bankruptcy courts are not required "to divine what might have happened" with respect to the creditor's diligence, or lack thereof, in exercising its collection remedies. Id. at 306.

Debtor contends the FDIC failed to make any showing of proximately-caused damages beyond the unpaid debt and the bankruptcy court improperly shifted the burden to him on this

-50-

element. Siriani would appear to apply only to those transactions that were renewals of credit — i.e., the ten loan modifications and/or maturity date extensions — which Debtor seems to concede, and not to the "new" money transactions. The FDIC contended that the Bank had collection remedies based on the promissory notes, collateral and abundance of caution liens filed for the various loans. These collection remedies were extended each time a loan was modified or extended. After the modifications and maturity date extensions when Debtor defaulted and failed to make the required payments, the Bank began foreclosure proceedings. However, due to Debtor's bankruptcy filing, the FDIC as receiver for the Bank was unable to collect all of the remaining outstanding loans, unless the court determined the debts were excepted from discharge, for which Debtor was also a guarantor.

We conclude that the FDIC made a sufficient evidentiary showing of proximate cause for the loan modifications and/or maturity date extensions. Therefore, any potential error by the bankruptcy court was harmless, as the record supports a proximate cause finding for the renewals that occurred in this case.

Debtor does not appear to challenge the bankruptcy court's proximate cause finding as to the eight "new" money loans. To the extent he does, we conclude the court's finding was not clearly erroneous. For new money loans, proximate cause is established when the falsehoods are material and involve significant amounts of money. Candland, 90 F.3d at 1471. Here, the falsehoods were material and involved significant amounts of money, far greater than the amount at issue in Candland.

Accordingly, except for Loan 9 and Loan 10, we conclude the

-51-

bankruptcy court did not err in determining that amounts owed on account of the loans are nondischargeable under § 523(a)(2)(B).

**B.    The bankruptcy court did not err in excepting Loan 9 and Loan 10 from discharge under § 523(a)(2)(A).**

For this claim, we address only Loan 9 and Loan 10, as we have already concluded the bankruptcy court did not err in determining the other loans were excepted from Debtor's discharge under § 523(a)(2)(B).

Section 523(a)(2)(A) excepts from a debtor's discharge debts resulting from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  A creditor seeking to except a debt from discharge based on fraud must establish each of five elements:  (1) misrepresentation, fraudulent omission or deceptive conduct; (2) knowledge of the falsity or deceptiveness of such representation(s) or omission(s); (3) an intent to deceive; (4) justifiable reliance by the creditor on the subject representation(s) or conduct; and (5) damage to the creditor proximately caused by its reliance on such representation(s) or conduct.  Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); In re Weinberg, 410 B.R. at 35.  By its terms, a creditor will not be entitled to a claim under § 523(a)(2)(A) if the debtor's fraudulent representations consist of "statement[s] respecting the debtor's or an insider's financial condition." Heritage Pac. Fin., LLC v. Edgar (In re Montano), 501 B.R. 96, 102 n.5 (9th Cir. BAP 2012).

**1.    False representation made with intent to deceive**

In addition to affirmative false representations not

respecting a debtor's or insider's financial condition, a debtor's silence or omission of a material fact can constitute a false representation for purposes of § 523(a)(2)(A). Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089 (9th Cir. 1996). However, in order to find liability for fraud based upon silence or omission, there must be a duty to disclose. Id.

Loans 9 and 10 were funded in early August 2006. By this time, Debtor was well aware of the WCAB Stay and the criminal investigation pending against Premier and the negative impact these two things had, or could have, on his income and ability to repay the loans. The WCAB Stay was imposed in June 2004 and precluded Tammy from collecting on approximately $70 million in lien claims. Debtor never informed the Bank in writing about the WCAB Stay. Although he claimed he told the Bank's president about it, the bankruptcy court found that no evidence in the record suggested this information went from the president to the Bank. Even if this finding was erroneous, which we do not conclude, Debtor admitted he knew as early as 2005 that a waiver of the Premier receivables could be a condition of a plea agreement. That meant he would not receive several millions of dollars in income he repeatedly told the Bank he would. Debtor admitted he never informed the Bank in writing or otherwise about the Premier investigation or potential waiver.

Due to their business relationship, Debtor had a duty to disclose the material information about Premier to the Bank when applying for Loans 9 and 10. See In re Eashai, 87 F.3d at 1089 (citing to the Restatement (Second) of Torts § 551(1)(1976)). The bankruptcy court's finding that he had a duty to do so was not

clearly erroneous. Further, Yoder testified that the negative impact on Premier receivables is something he and the Bank would have wanted to know before making any loans, as it could have affected Debtor's ability to handle his projects. Thus, Debtor's failure to disclose the problems facing Premier was an omission of a material fact.

As with § 523(a)(2)(B), intent to deceive under § 523(a)(2)(A) can be shown by a debtor's reckless disregard for the truth of a representation, or reckless indifference to the debtor's actual circumstances. In re Anastas, 94 F.3d at 1286. The bankruptcy court found that Debtor had acted with the requisite recklessness to establish his intent under § 523(a)(2)(A), particularly with his failure to disclose Premier's problems. This finding is not clearly erroneous. By the time Loans 9 and 10 were funded, Debtor had actual knowledge of the problems facing Premier and how it could negatively impact his income. Withholding this material information about Premier from the Bank establishes, at minimum, a reckless indifference to the truth, if not actual intent to deceive. Thus, the FDIC established Debtor's intent for purposes of § 523(a)(2)(A).

**2. Damages as a result of reliance on the false representation**

For a claim under § 523(a)(2)(A), a creditor must also show it was justified in relying on the debtor's false representations. Field v. Mans, 516 U.S. 58, 73-76 (1995); In re Eashai, 87 F.3d at 1090. Justifiable reliance is a subjective standard, which turns on a person's knowledge under the particular circumstances. In re Eashai, 87 F.3d at 1090.

-54-

As the bankruptcy court correctly noted, nondisclosure of a material fact in the face of a duty to disclose can establish the requisite reliance and causation for actual fraud under the Code. Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte), 96 F.3d 1319, 1323 (9th Cir. 1996). The Supreme Court recognized in the context of securities fraud the difficulty of proving the reliance or causation elements in a case of fraudulent nondisclosure in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972). In Apte, the Ninth Circuit extended the holding of Affiliated Ute Citizens to the context of fraud cases under the Code:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

In re Apte, 96 F.3d 1319, 1323 (quoting Affiliated Ute Citizens, 406 U.S. at 153-54).

Debtor contends the Bank's reliance was not justified based on the "entire forest of red flags when underwriting the 18 loans and making its credit decision." This argument fails to address the omissions in this case, particularly Debtor's failure to disclose the detrimental information about Premier of which he was aware. The bankruptcy court found the Bank had established justifiable reliance due to the nature of the undisclosed information. We perceive no clear error with this finding.

As to Loans 9 and 10, FDIC expert Tarter opined that the Bank was justified in relying on Debtor's failure to disclose the

-55-

Premier investigation, as it was not a fact the Bank could have reasonably discovered. "[A] party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover." In re Apte, 96 F.3d at 1324. In addition, Yoder indicated that the trouble with Premier was important information the Bank would have considered when making the loans or modifications. Thus, the Bank established justifiable reliance.

Finally, the creditor must establish that the claim sought to be excepted from discharge arose from an injury proximately resulting from its reliance on the debtor's misrepresentations. Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir. 1991). Because Debtor failed to disclose the material information regarding Premier, the Bank's proximate cause for Loans 9 and 10 was established. These loans were not repaid, and the Bank suffered an actual loss as a result. Thus, Loans 9 and 10, which totaled approximately $3.5 million, were properly excepted from Debtor's discharge under § 523(a)(2)(A).

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment.

-56-